IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JENNIFER E. MUELLER,                                Case No. 3:22-cv-01132-SB

              Plaintiff,                      **FINDINGS AND**
                                     **RECOMMENDATION**

        v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

              Defendant.

**BECKERMAN, U.S. Magistrate Judge.**

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Northwest Permanente, P.C. ("Northwest Permanente") maintained ERISA-governed benefits plans that provided short-term disability ("STD") and long-term disability ("LTD") to its employees, including Plaintiff Jennifer Mueller ("Plaintiff"), a family medicine physician. Defendant Hartford Life and Accident Insurance Company ("Defendant") issued the policy that funded the LTD benefits and served as the claims administrator.

Plaintiff sought benefits pursuant to her LTD plan. When Defendant denied her claim, Plaintiff sought review in this Court. The parties now cross-move for judgment pursuant to

PAGE 1 – FINDINGS AND RECOMMENDATION

Federal Rule of Civil Procedure ("Rule") 52(a). The Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), but not all parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636. For the reasons explained below, the Court recommends that the district judge deny Defendant's motion and grant Plaintiff's motion.

BACKGROUND[1]

## I.      THE PARTIES AND LTD PLAN

Plaintiff worked as a family medicine physician for Northwest Permanente and participated in Northwest Permanente's ERISA-governed LTD plan, which Defendant insured and administered. (Answer ¶¶ 4-6, ECF No. 8; HART 3, 100-01, 119, 121, 513, 688-704, 712-51; PLAN 1-43.)

In the "Benefits" section, the LTD plan provides that claimants are entitled to monthly benefits if they (1) "become Disabled while insured under [the plan]," (2) "are Disabled throughout the [180-day] Elimination Period," (3) "remain Disabled Beyond the [180-day] Elimination Period," and (4) "submit Proof of Loss to [Defendant]."[2] (PLAN 9, 14) (bold and all caps omitted). In the same section, the LTD plan further provides that "[b]enefit payments will stop" on the date that the claimant is "no longer under the Regular Care of a Physician[.]" (PLAN 16.)

---

[1] The parties submitted a four-part stipulated record for judicial review. (*See* Stipulated R. Jud. Rev. at 1-3, ECF No. 14.) The four parts are: (1) the LTD plan, which is Bates-stamped as "PLAN 000001-43" (ECF No. 14-1 at 1-43); (2) the STD plan, which is Bates-stamped as "STD PLAN 000001-21" (ECF No. 14-2 at 1-21); (3) the LTD record for judicial review, which is Bates-stamped as "HART 000001-936" (ECF No. 14-3 at 1-936); and (4) the STD record for judicial review, which is Bates-Stamped as "STD AR 000001-131 (ECF No. 14-4 at 1-131). (*Id.* at 1.) Like the parties, the Court refers to each part by its Bates stamp numbers, omitting any initial zeroes.

[2] "An elimination period is the length of time a claimant must wait before benefits begin." *Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 540 n.2 (7th Cir. 2000).

PAGE 2 – FINDINGS AND RECOMMENDATION

In the "General Provisions" section, the LTD plan provides that "Proof of Loss" includes, but is not limited to: (1) documents reflecting the claimant's disability onset date, the cause of the claimant's disability, the claimant's prognosis, the claimant is under the "Regular Care of a Physician," and the claimant's pre-disability earnings, current monthly earnings, and other income, (2) "any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes," (3) the names and addresses of the medical professionals who the claimant consulted, hospitals or medical facilities where the claimant received treatment, and pharmacies where the claimant filled prescriptions within the past three years, and (4) a signed authorization for Defendant to obtain and release the claimant's medical, employment, and financial information, as well as "any other information [Defendant] may reasonably require[.]" (PLAN 20-21) (bold and all caps omitted).

In the "Definitions" section, the LTD plan provides that "Disability or Disabled" means that the claimant cannot "perform[] one or more of the Essential Duties of (1) Your Occupation during the Elimination Period; and (2) Your Occupation following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings." (PLAN 24) (bold and all caps omitted). The LTD plan adds that a claimant's "[d]isability must result from," among other things, an "accidental bodily injury" or "sickness." (PLAN 25.)

Also relevant are the LTD plan's definitions of "Essential Duty," "Regular Care of a Physician," and "Your Occupation." The LTD plan provides that an "Essential Duty" is a duty that is "substantial, not incidental," "fundamental or inherent to the occupation," and "cannot be reasonably omitted or changed," and that the "ability to work the number of hours in Your

PAGE 3 – FINDINGS AND RECOMMENDATION

regularly scheduled work week is an Essential Duty." (PLAN 25) (bold omitted). The LTD further provides that "Regular Care of a Physician" means that the claimant is being treated by a licensed physician whose (1) "medical training and clinical experience are suitable to treat [the claimant's] disability condition," and (2) treatment is "consistent with the diagnosis of the disabling condition," "according to guidelines established by medical, research, and rehabilitative organizations," and "administered as often as needed . . . to achieve the maximum medical improvement."[3] (PLAN 26-27) (bold omitted). The LTD plan also provides that "Your Occupation means Your Occupation, as it is recognized in the general workplace, that You were routinely performing prior to becoming Disabled," and that "Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." (PLAN 28) (bold omitted).

## II.    PLAINTIFF'S ACCIDENT AND MEDICAL RECORDS

On March 22, 2019, Plaintiff presented for a post-hospitalization follow-up with her primary care physician, Kathleen Laughlin, M.D. ("Dr. Laughlin"). (STD AR 115-18.) Dr. Laughlin noted that Plaintiff was involved in a "[b]ike versus bike" accident on March 18, 2019, when another bicyclist T-boned Plaintiff's bike, which caused Plaintiff to "fl[y] off [her] bike" and land on her face and the right side of her body. (STD AR 115.) Dr. Laughlin added that Plaintiff lost consciousness at the scene, Plaintiff suffered "quite a bit of amnesia in the hours after the accident," and emergency responders transported Plaintiff to the Oregon Health and Science University hospital, where medical providers diagnosed Plaintiff with a concussion, right maxillary fracture, and contusions and kept Plaintiff "overnight for observation." (STD AR

---

[3] The LTD plan states that "[p]hysician means a person who is . . . not [the claimant] or [r]elated to [the claimant] by blood or marriage." (PLAN 26-27) (bold omitted).

115; *see also* HART 789, noting a fracture in Plaintiff's alveolar bone and splinting of several teeth).

Dr. Laughlin listed post-concussion syndrome ("PCS") as Plaintiff's primary diagnosis, noting that Plaintiff reported that she was "still very tired," suffering from decreased concentration and "brain power," continuing to experience episodes of positional or movement-related vertigo but a medication "seem[ed] to help," having "[s]ome headaches in the evening," and "[w]alking around by herself." (STD AR 115, 117.) Dr. Laughlin explained that "many [PCS] patients have symptoms for [the] first [six] weeks but tend to do quite well after that point," and Plaintiff's "symptoms [would] likely improve over [the] next [six] weeks." (STD AR 115, 117.) Dr. Laughlin added that Plaintiff was suffering from "minimal [facial] discomfort," and referred Plaintiff to physiatry, physical therapy, and speech and language therapy. (STD AR 117.)

On March 24, 2019, an x-ray of Plaintiff's right clavicle revealed an "[a]natomic alignment," no evidence of fracture, and a normal acromioclavicular ("AC") joint. (STD AR 121-22.)

On March 26, 2019, Bruce Stelmack, D.O. ("Dr. Stelmack"), a physiatrist, conducted a chart review and noted that Plaintiff's primary diagnosis was sequela of a traumatic brain injury ("TBI"), namely, PCS, a mild cognitive impairment, and ataxia.[4] (HART 788-98.) Dr. Stelmack also reviewed Dr. Laughlin's treatment notes and referral and computed tomography ("CT") scans of Plaintiff's head and spine and an x-ray of Plaintiff's pelvis, which respectively revealed (1) no acute intracranial abnormality or evidence of hemorrhage, mass, or acute infarction, (2) no

---

[4] Sequela "mean[s] the aftereffect of disease or injury," *Zuber v. Boscov's*, 871 F.3d 255, 259 n.1 (3d Cir. 2017) (simplified), and "[a]taxia is an inability to coordinate muscle activity during voluntary movement." *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.3 (9th Cir. 2005) (simplified).

PAGE 5 – FINDINGS AND RECOMMENDATION

acute spine fractures or destructive changes, and (3) no acute fracture of dislocation. (HART 788-98.) Dr. Stelmack explained that Plaintiff "[m]ay need further imaging depending on [her] progress with balance and pain," that he recommended a brain injury medicine consultation if Plaintiff's physician or speech, physical, or occupational therapist so "advise[d]," and that he "[a]dvise[d] [Plaintiff to contact] optometry followed by [a] neuro optometry consult and [occupational therapy] evaluation if [there were] any issues with [her] vision." (HART 798) (bold omitted).

On April 8, 2019, Plaintiff presented for an occupational therapy appointment with Kathryn Chaimov, O.T. ("Chaimov"). (HART 800-06.) Chaimov listed PCS as Plaintiff's diagnosis and visual disturbance and nausea as secondary diagnoses. (HART 800.) Chaimov stated that Plaintiff's "subjective report[s] and objective findings [were] consistent with visual sensitivity including light sensitivity, impaired reading and screen use, fatigue, impaired concentration and processing speed, [and] concerns for convergence insufficiency status post-concussion," Plaintiff would "benefit from skilled [occupational therapy] to reduce [her] symptoms and develop strategies in order to facilitate [a] graded return to functional activity and resume [her instrumental activities of daily living] without or with fewer limitations," and Plaintiff would "likely need modified duty and hours when returning to work, including reduced hours, [and] extra rest breaks." (HART 800.) Chaimov added that Plaintiff's "[b]iggest concerns [were her] vision, fatigue, [and] processing speed/capacity," Plaintiff was not having headaches, Plaintiff "[h]ad vertigo before[] [but did] not feel she need[ed] physical therapy at [that] time," Plaintiff's brief dizziness "after getting up . . . [was] not functionally limiting at [that] time," Plaintiff found it challenging when she attempted to follow a sewing pattern, Plaintiff's "vision activities [generally] provoke nausea, but not dizziness or headache," and after being "unable to

PAGE 6 – FINDINGS AND RECOMMENDATION

watch Spiderman" a week before, Plaintiff was "able to watch a Star Wars movie." (HART 801.) After evaluating Plaintiff, Chaimov advised Plaintiff on the plan of care, symptom management strategies, considerations related to returning to work, and a home exercise program. (HART 804.)

On April 11, 2019, Plaintiff attended a follow-up video visit with Dr. Laughlin regarding her PCS. (STD AR 120-21.) Plaintiff reported that she had "improved energy over the weekend" and difficulty with double vision and the testing during her occupational therapy earlier in the week. (STD AR 120.) Plaintiff also reported that her headaches were "[r]are," she had issues with "[i]mbalance just in the morning briefly [but] then does fine during the day," and she "[r]ealize[d] that she [was] still quite fatigued and ha[d] trouble concentrating," as she "[t]ried to do inbox work and [did not] get much done in [two] hours." (STD AR 120.) Dr. Laughlin stated that Plaintiff was "improving" but she was "not ready to go back to work," Plaintiff would "discuss [a] time frame" for returning to work with physiatry and gradually increase her activity in conjunction with occupational therapy, she "[o]ffered [Plaintiff] support," and she advised Plaintiff that she "may have energy every other day" and "need[ed] to pace herself." (STD AR 121.)

Later that same day, April 11, 2019, Plaintiff presented for an in-person physiatry and neurological rehabilitation consultation with Dr. Stelmack. (HART 807-15.) Plaintiff reported that she had been unable to drive or return to work, performing eye exercises as part of her occupational therapy, and suffering from occasional, non-severe headaches, "ongoing fatigue, photophobia, reduced tolerance to read or screen time[,] and vertigo with getting up quickly or rolling over." (HART 808.) Plaintiff also reported that she attempted to "return to work recently for [two] hours but was very limited, slow [with] processing[,] and unable to accomplish much."

PAGE 7 – FINDINGS AND RECOMMENDATION

(HART 808.) Dr. Stelmack observed that during his neurological examination, Plaintiff exhibited a "slight skew" and esophoria in her right eye and a Dix-Hallpike test "produce[d] vertigo and brief nystagmus [that was] left ear dependent."[5] (HART 813.) Dr. Stelmack's impression was PCS with "photophobia, peripheral vertigo, fatigue[,] and [an] eye movement [disorder] with reduced screen time/reading time." (HART 813.) Dr. Stelmack recommended that Plaintiff perform daily mindfulness exercises, stop taking melatonin because it could "cause fatigue," start medication trials of half strength trazadone "if needed for sleep" and amantadine, and attend her optometry and neuro optometry appointment, speech therapy evaluation, and physical therapy. (HART 813-14.)

Four day later, on April 15, 2019, Dr. Stelmack completed an attending physician's statement and progress report. (STD AR 125-26.) Dr. Stelmack listed PCS as Plaintiff's primary condition and insomnia, mild cognitive impairment, and left peripheral vertigo as secondary conditions, and noted symptoms of ongoing fatigue, photophobia, "reduced tolerance to read or screen time," vertigo when "getting up quickly or rolling over," and an inability to drive or return to work. (STD AR 125.) With respect to Plaintiff's current treatment plan, Dr. Stelmack cited clinical supervision, rest, prescription medications, referral to physical therapy, eye care, occupational therapy, speech and language therapy, physiatry, and otolaryngology (i.e., an ear, nose, and throat ("ENT") specialist). (STD AR 125.) Dr. Stelmack added that Plaintiff was "[u]nable to work" from March 18, 2019 through May 5, 2019, Plaintiff's status was improved,

---

[5] The Court notes that "[t]he Dix-Hallpike test, or maneuver, is used to check for a common type of vertigo called benign paroxysmal positional vertigo." *Zackary C. v. Kijakazi*, No. 22-cv-00065, 2023 WL 5550118, at *5 n.2 (D. Mont. Aug. 29, 2023) (citation omitted). The Court also notes that esophoria means "a tendency for the eyes to turn inward," *Qualls v. Astrue*, 428 F. App'x 841, 847 n.6 (10th Cir. 2011) (simplified), and that "[n]ystagmus is a vision condition in which the eyes make repetitive, uncontrolled movements[, which] often result in reduced vision and depth perception and can affect balance and coordination." *Thibeaux v. Berryhill*, No. 16-cv-00952, 2017 WL 1946307, at *4 (C.D. Cal. May 10, 2017) (simplified).

and he estimated that Plaintiff could return to work in some capacity on May 6, 2019. (STD AR 125-26.)

On April 17, 2019, Plaintiff presented for an initial physical therapy evaluation with Sarah Woodell, P.T. ("Woodell"). (HART 816-21.) Woodell noted that Plaintiff's subjective reports and objective findings were consistent with PCS, there was "no evidence of benign paroxysmal positional vertigo [on that day] with testing," and Plaintiff would "benefit from skilled [physical therapy] intervention to reduce [her] symptoms and optimize [her] functional movement in order to resume all activity." (HART 816.) Woodell also noted that Plaintiff's dizziness was "getting better," that "[b]alance [was] not an issue," and that Plaintiff had "chronic vertigo with certain yoga poses, [and] feels like the world is rocking." (HART 817.) After completing her evaluation, Woodell provided Plaintiff with a home exercise program and noted that the exercises were "designed to induce [a] mild/moderate amount of symptoms." (HART 816-20.)

The next day, April 18, 2019, Plaintiff participated in an occupational therapy telephone visit with Chaimov. (HART 822-23.) Plaintiff reported that she was "off work for another [two] weeks," was "[f]eeling much better since [the] weekend," had not needed any midday naps, feels "[w]orse when she goes somewhere," had vision trouble after two hours on the computer, read a "graphic novel" for "no length of time," and tried a "modified homemade version" of a vision therapy tool, which "[s]eemed like really hard work." (HART 822.) Chaimov advised Plaintiff to shorten and increase the frequency of, and use glasses and unbusy backgrounds with, her home exercise sessions, track her home exercise progress, and "grad[e] [her] return to community places," e.g., "Big box stores, [and] fluorescent lights." (HART 822.)

///

PAGE 9 – FINDINGS AND RECOMMENDATION

In a treatment note dated April 25, 2019, Chaimov noted that Plaintiff was "progressing toward [her] goals as anticipated [and] indicated by [her] decreasing symptoms, but [she was] not at her previous level of function." (HART 824) (bold omitted). Chaimov added that Plaintiff was still working on her "pacing and gradual return to activities," Plaintiff was "having a hard time pacing" because "sometimes [she] feels fine" and increases her activity level, but "then has [a] long recovery period," Plaintiff "did nothing" the day after taking "[a] couple longer walks, [and] plant[ing] [a] garden," Plaintiff continued to suffer from "light sensitivity and [an] impaired ability to use [her] computer and read," Plaintiff had no headaches after she avoided use of the computer, Plaintiff was compliant with her home exercise program recommendations, Plaintiff would benefit from additional therapy, and Plaintiff would "likely need modified duty and hours when returning to work, including reduced hours, [and] extra rest breaks." (HART 824-26.)

On April 29, 2019, Plaintiff presented for an initial speech therapy evaluation with Abigail Ann Cary ("Cary"), a speech pathologist. (HART 827-30.) Cary noted that Plaintiff's "subjective report[s] and objective findings [were] consistent with [PCS,] including changes from baseline in word-finding, attention, and memory," and Plaintiff would benefit from speech therapy to "reduce [her] symptoms and optimize [her] functional communication for [her] return to work and participation in home and community activities." (HART 827.) During the evaluation, Plaintiff reported pacing was "still a struggle," she had been "very intentional with [her] home activities, but was still over-do[ing] it," her word-finding difficulties did "not limit [her] function," her memory was "fine, but [her] husband report[ed] that she may be forgetful," she did not have "long-term memory issues" or "difficulty with sustained attention," she felt "'stuck' for [the] past week without noted improvement in any [of her] symptoms," her light

sensitivity had "improved in general, [and is] worse when [she is] tired," her dizziness, which "feels like being on a boat," was "'bad' in the beginning, but is better now" and "[g]ets worse when she 'earns' it." (HART 828.) Cary observed that Plaintiff's examination results were within normal limits, and she had an "optimistic outlook" regarding Plaintiff's recovery. (HART 829-30.)

On May 2, 2019, Plaintiff visited Nanette Curtis, O.D. ("Curtis"), for an eye examination. (HART 831-35.) Curtis noted that Plaintiff's "[d]ilated ocular health [was] unremarkable" in both eyes and Plaintiff had a refraction disorder (i.e., hyperopia, astigmatism, and presbyopia). (HART 832.)

Also on May 2, 2019, Plaintiff participated in a follow-up telephone visit with Chaimov. (HART 836-37.) During the visit, Plaintiff reported that she felt "horrible" after recently watching a movie and the feeling "carried over to [the] next day," she utilized "strategies including sun glasses, eye breaks, [and] pacing" during the movie, her cardiopulmonary resuscitation ("CPR") class "provoked [a] headache, as [did her] reading [of the CPR] course textbook," and she planned to take two "additional weeks off work before starting [her] transition with part time." (HART 836.) Chaimov advised Plaintiff regarding the "importance of looking for [a] successful level of activity, not maximal tolerance/symptoms," and instructed Plaintiff to continue her home exercise program and return to the clinic the following week. (HART 836.)

On May 6, 2019, Dr. Laughlin completed an attending physician's statement and progress report. (STD AR 106-07.) Dr. Laughlin described the same subjective symptoms and current treatment plan as Dr. Stelmack, and listed PCS as Plaintiff's primary condition and nausea, visual disturbance, and cognitive linguistic dysfunction as Plaintiff's secondary

PAGE 11 – FINDINGS AND RECOMMENDATION

conditions. (STD AR 106.) In terms of objective physical findings, Dr. Laughlin noted that a Dix-Hallpike test "produce[d] vertigo and brief nystagmus [that was] left ear dependent," and Plaintiff exhibited esophoria in her right eye. (STD AR 106.) Dr. Laughlin added that Plaintiff's current status was improved, she expected that Plaintiff could return to work on May 20, 2019, and Plaintiff "[m]ay work [four] hours per day, [four] days a week from [May 20, 2019 through June 2, 2019]." (STD AR 107.)

That same day, May 6, 2019, Dr. Laughlin completed a work status report. (STD AR 108.) In the report, Dr. Laughlin stated that she placed Plaintiff off work from March 18, 2019 through May 19, 2019, placed Plaintiff on modified activity at work and home from May 20, 2019 through June 2, 2019, and recommended that Plaintiff work no more than four "hours per day, [four] days a week" from May 20, 2019 through June 2, 2019. (STD AR 108.)

During an occupational therapy visit on May 8, 2019, Fernando Chiang, O.T. ("Chiang") assessed that Plaintiff's therapy progress was "[f]air," Plaintiff's updated rehabilitation potential was "good," and "physical" issues were potential barriers to Plaintiff achieving her goals. (HART 838.) Chiang also noted that Plaintiff reported that her "capacity for decision making throughout the day [was] improving but [she continued to] get fatigued," she was "concerned about her ability to return to work and read [medical] charts," her dizziness was not "too much of an issue and [was] less in frequency, duration, and intensity," her "[l]ight sensitivity, nausea, [and] headache[s] [were] still associated with reading," she was "napping infrequently throughout the week, [and] no longer on a daily basis," she felt "good about being [able] to remember [the] CPR steps and pass the [CPR] course," she planned to return work part time, and she was "able to get through the day doing basic/minimal activities with minimal symptoms." (HART 840.) Chiang added that Plaintiff received tips on reading and using a computer after a

PAGE 12 – FINDINGS AND RECOMMENDATION

concussion, performed her home exercise program in the clinic, attended therapy with her "memory journal" and "sunglasses and reading glasses," and took "notes during [the] session." (HART 842-43.)

On May 14, 2019, Plaintiff attended a second speech therapy session with Cary. (HART 845.) During the session, Cary and Plaintiff "addressed compensatory strategies, including planning to reduce distractions/cognitive load with [the] return to work," Plaintiff "generated a [ten plus] item to-do list with [respect to her] plan to return work including reducing visual clutter in [the] office, delegating more tasks to nursing, dictating more chart notes in [the] office, and reviewing charts at [the] beginning of the day," and Plaintiff reported that she was "going to go into the office [that] week to figure out how to control lighting and screen use." (HART 845-46.)

In a treatment note dated May 21, 2019, Cecilia Saqueton Muraki, O.D. ("Dr. Muraki") noted that Plaintiff presented with vision problems, Plaintiff returned to work part-time the previous day, Plaintiff's residual symptoms included "provocation of fatigue, photophobia, headache, [and] word finding," and Plaintiff reported that she had not "got[ten] back into reading and [was] unsure why," she found it "[h]ard to to look at her Apple watch," and during her return to work, she performed "only inbox management," wore "blue block glasses," and experienced nausea and photophobia by 9:30 a.m., as well as a "perception of words floating." (HART 847-48.) On examination, Plaintiff exhibited "[c]onvergence insufficiency," a "[n]arrow fusion range at near," and "[p]oor vergence facility," which, according to Dr. Muraki, were "[l]ikely contributors to [Plaintiff's] decreased interest in reading, [and] provocation of headache and fatigue after sustained near activity." (HART 849.) Dr. Muraki recommended that Plaintiff continue her vision remediation sessions with occupational therapy, prescribed "brown blue

PAGE 13 – FINDINGS AND RECOMMENDATION

block tint in near vision glasses," and asked Plaintiff to return in three months for a visual skills reassessment. (HART 849-50.)

During a telephone encounter with Cary on June 12, 2019, Plaintiff reported that she had been working five "half days per week," she "feels like her brain is doing what it needs to do" when she is at work, she had "really stuck with limiting [her] exertion outside of work," she needed to "take naps over the weekend," and she was "[f]eeling discouraged by [her] increased fatigue." (HART 852.) Cary explained that Plaintiff's increased fatigue was understandable given her "increased work demands and performance," encouraged Plaintiff to "generat[e] a list of activities to progressively include in [her] home/work life," stated that Plaintiff's cognition was "progressively improving, but she [was] not back to baseline," and "[r]elayed [her] impression that [Plaintiff would] likely be back to baseline in [approximately three] months[.]" (HART 852.)

The following month, on July 25, 2019, Plaintiff participated in a telephone visit with her primary care physician, Dr. Laughlin. (HART 854.) During the visit, Plaintiff reported that she was "definitely better," she had been "tak[ing] 'the longer view of things,'" she had been "seeing [six] patients daily," and her prescription glasses for "photosensitivity and [with] prisms for double vision" had "really helped." (HART 854.) Plaintiff, however, also reported that "sometimes [she was] very tired and ha[d] trouble with concentration and [could not] explain why," she "went blueberry picking for one hour and it made her tired for several days," she had been trying to "pace her activities when [she was] not working," she had done "some driving, but [was] not yet driving on [the] freeway," she "tried to walk [two] miles and it really set her back," she was suffering from neck pain and headaches that would "wake her up in the morning," and she was "[a]pproaching [six] months from injury [and] thinking about long-term disability."

PAGE 14 – FINDINGS AND RECOMMENDATION

(HART 854.) Dr. Laughlin encouraged Plaintiff to "start 'low and go slow'" with attempts to exercise, stated that Plaintiff did not have a "bite guard anymore [and was] scheduled to get braces" and thus Plaintiff's neck pain and headaches were "likely multifactorial," and noted that Plaintiff had re-established care with her counselor and planned to see a craniosacral therapist. (HART 854.)

Plaintiff returned to occupational therapy on July 31, 2019. (HART 856.) Jane Malone, O.T. ("Malone"), noted that Plaintiff presented with "continued functional vision limitations with reading and difficulty pacing [herself] back to physical activities due to fear of exacerbating [her] symptoms, and lower endurance for community outings," and that Plaintiff's plan of care included "up to [fourteen to twenty] additional visits through [December 31, 2019]." (HART 857.) Malone also noted that Plaintiff performed and received guidance on new home exercises, and reported that reading was "still challenging," she had been addressing "her mental health and [felt] supported by [her] family and current counselor," she wanted to "improve her vergence skills to progress back to cycling," and she "felt 'motion sick' after tranaglyph training." (HART 859-60.)

On August 14, 2019, Plaintiff participated in a speech therapy telephone appointment with Cary. (HART 861.) Plaintiff reported that she was "getting much better at pacing," she did not meet her goal of walking three times a week for fifteen minutes because she had an "exercise episode [where] she had [a] cognitive impact," she was "[s]till not driving," she was working part-time, she "[r]eally notices when she needs her prism glasses by [the] end of [the] day," she was still having "teeth pain" but was "[h]aving less pain with [her] craniosacral work," and she was "[s]leeping better, but [thought that] she may need more [sleep]." (HART 861.) Cary assessed that Plaintiff was suffering from "slowly resolving [PCS]" and noted that Plaintiff's

PAGE 15 – FINDINGS AND RECOMMENDATION

"[s]peech and cognition appear[ed] grossly [within normal limits], but may be impacted by other [PCS] symptoms such as fatigue, pain, stress, [and] cognitive overload." (HART 861-62.) Cary encouraged Plaintiff to "continue pacing" and working with occupational therapy on her PCS. (HART 861.)

In a telephone encounter note dated August 23, 2019, Dr. Laughlin noted that Plaintiff's father passed away that week and Plaintiff "went to [the] Midwest to see him before he [passed away] and stayed for the funeral," which was "the most activity [she had recently] had in a week." (HART 863.) Plaintiff also reported that she "started exercising at a lower level [but could not] close [her] charts by the end of the day," her "normal dog walk is what she [could] do, but [she could not] walk much farther," and she was still "working [five] half-days weekly [but was] considering adding another [two] hours of virtual time . . . [at the] end of September or early October." (HART 863.) Dr. Laughlin's discussion with Plaintiff focused on bereavement. (HART 863.)

Plaintiff presented for a follow-up office visit with Dr. Muraki on September 11, 2019. (HART 865.) Plaintiff reported that her photophobia was "improving," she was working five hours a day, and she had "awareness of double vision now, [e.g.,] threading [a] needle." (HART 866.) After examining Plaintiff, Dr. Muraki noted that Plaintiff's "[p]oor vergence facility and fusion range at baseline [was] now in [the] expected range even when wearing glasses with no prism compensating [for] convergence insufficiency," she reviewed Plaintiff's "use of jump duction tranaglyph [and advised] continue[d] use to maintain [Plaintiff's] gains in vergence facility," she would "decrease [the] brown blue block tint in [Plaintiff's] near vision glasses" because Plaintiff's photophobia was improving, she anticipated that she may "remove [the]

PAGE 16 – FINDINGS AND RECOMMENDATION

prism" from Plaintiff's "next glasses," and Plaintiff needed a visual skills reassessment in two months. (HART 867.)

On September 13, 2019, Dr. Laughlin completed her second attending physician's statement and progress report. (STD AR 79-80.) Dr. Laughlin continued to list PCS as Plaintiff's primary condition, listed recurrent episodes of major depressive disorder as Plaintiff's secondary condition, and stated that Plaintiff's subjective symptoms were fatigue, photophobia, headache, "word finding," and a "decreased interest in reading." (STD AR 79.) With respect to Plaintiff's current treatment plan, Dr. Laughlin reported that Plaintiff continued be under clinician supervision, take prescription medications, participate in physical therapy, and perform "reduced work hours of [four] hours per day, [five] days per week starting [on October 1, 2019 through December 31, 2019]." (STD AR 79.) Dr. Laughlin described Plaintiff's current status as "[u]nchanged," and provided the following comments regarding Plaintiff's objective physical findings:

> [Plaintiff] is being treated for light sensitivity, impaired reading and screen use, fatigue, decreased concentration and processing speed, concern for convergence insufficiency [status post-]concussion [on March 18, 2019]. [Plaintiff] is making slow steady gains with improved ability to read and use [the] computer before being limited by her symptoms. [There has been some] [m]oderate improvement with dizziness and nausea during activities. [Plaintiff] will benefit from continued skilled [occupational therapy] intervention to advance [her] visual skills, utilize compensatory strategies, [and be] independent with [her home exercise program] in order to facilitate [a] graded return to functional activity [and in turn] be able to resume [instrumental activities of daily living] without or with fewer limitations.

(STD AR 79-80.)

On September 20, 2019, Plaintiff visited Malone's office for her fifth occupational therapy session. (HART 869.) Plaintiff reported that she had "not been performing her [home] exercises due to fatigue after [the recent] Dr. Muraki visit and increased workload," and she felt "a little 'motion sick' after tranaglyph training but [that was] normal for her reaction[.]" (HART

PAGE 17 – FINDINGS AND RECOMMENDATION

872.) Malone observed that Plaintiff presented with "improvement in [her] functional vision limitations," Plaintiff had "improved pacing [herself] back to [her] physical activities, but continue[d] to fear exacerbating [her] symptoms," Plaintiff had "met [three] of her short-term goals during [the] last reporting period," and Plaintiff "continue[d] to struggle with resuming her typical physical activities[,] such as [a] regular cardiovascular routine[,] due to delayed fatigue onset afterwards and potentially not recognizing signs of overexertion." (HART 870.) Malone also noted that Plaintiff was "nearing discharge readiness from [an occupational therapy] perspective as [the] majority of [her] vision exercises [were] being directly addressed by [visits with] Dr. Muraki," and that she advised Plaintiff that she could contact her with "any additional questions or concerns throughout her recovery" and schedule a physical therapy appointment to "discuss returning to physical activity . . . and/or to do [a] formal treadmill study." (HART 870, 873.)

On November 5, 2019, Plaintiff present for her two-month visual skills reassessment with Dr. Muraki. (HART 875.) Plaintiff reported that her photophobia was better on overcast days, she found it "better to wear [her] glasses with darker tint" with extended computer use but decreased tint had otherwise been sufficient, her headaches had not "been bad but [she had not] tried to read a book," she was working four hours per day, and she still found it "harder to multitask." (HART 876.) Dr. Muraki's assessment revealed that Plaintiff's "[v]ergence facility remain[ed] in [the] expected range," Plaintiff's "[f]usional vergence range continue[d] to expand and now [her] convergence range [was] excellent," Plaintiff's "[s]mall amplitude horizontal saccades [were] excellent," Plaintiff's "[p]hotophobia persist[ed] but [was] manageable with blue block tint," and it was okay to "discharge [Plaintiff] from vision remediation with [occupational therapy]." (HART 878.) Dr. Muraki asked Plaintiff to return in one year for a

PAGE 18 – FINDINGS AND RECOMMENDATION

visual skills reassessment and consider a "return visit to physiatry to discuss treatment options for residual [PCS] symptoms." (HART 878.)

In a telephone encounter note dated November 18, 2019, Dr. Laughlin noted that Plaintiff reported that she had been "less bad," the physician in charge at her office had "been very supportive [and she was not] go[ing] to [a] full [work] schedule for several months," she could not "jump back and forth from patients to [her] inbox [or] multitask as well," she started doing yoga at home but had not exercised and was "too chicken" to do so, she had not needed naps, and she still could not "schedule [two] things on a weekend." (HART 880.) Dr. Laughlin encouraged Plaintiff to "take it slow going back to [work] fulltime and also to consider alternatives such as virtual care," and "pace herself" during a family trip to Disneyland in early December. (HART 880.)

Dr. Laughlin completed another telephone encounter note on December 23, 2019. (HART 882.) Dr. Laughlin noted that Plaintiff was in Belgium and recently went on her family trip to Disneyland, where she was "easily nauseated by rides such as teacups [and suffered] vertigo after [that] ride" and "tried to modify, nap, [and] not go on as many rides." (HART 882.) Plaintiff also reported that she "felt really tired after she returned, felt slower, [and was] running father behind," she was sleeping twelve hours a day, she had to "call out one day," she did not "feel realistic about [her] symptoms," she "[f]elt like [she did] 'post-accident' [and it] took a week to feel back to baseline," and she was "frustrated [and did not] expect to have [that] happen." (HART 882.) Dr. Laughlin observed that Plaintiff "previously had some problems completing tasks," could not "multitask since [the] accident," may need "medication to help focus," and planned to follow up with physiatry and a "new doctor [there] with expertise in [PCS]." (HART 882.)

PAGE 19 – FINDINGS AND RECOMMENDATION

Also on December 23, 2019, Dr. Laughlin completed a work status report and placed Plaintiff "on modified activity at work and at home from [May 20, 2019] through [July 1, 2020]." (HART 910.) Dr. Laughlin added that Plaintiff required reduced work hours (i.e., no more than four "hours per day [and five] days per week") from May 20, 2019 through July 1, 2020. (HART 910.)

On February 5, 2020, Plaintiff presented for a follow-up physiatry consultation with Mona Mirchandani, D.O. ("Dr. Mirchandani"). (HART 884-91.) Plaintiff reported that she was "[c]urrently most bothered by: fatigue, low energy/decreased stamina, slower executive function, word finding difficulties, headaches, difficulty concentrating, [and] sleeping too much (requiring naps)." (HART 884) (bold omitted). Plaintiff also reported that she suffered from "poor sleep quality," her "symptoms improved with craniosacral therapy," and her trip to Disneyland "exacerbated her symptoms for [two] months." (HART 886.) Dr. Mirchandani determined that Plaintiff's "poor sleep and stress [were] likely confounding her symptoms of [PCS]," recommended "sleep hygiene for [Plaintiff's] poor sleep quality," advised Plaintiff to continue with her outpatient occupational therapy, speech therapy, home exercise program [for] physical therapy, meditation, and visits with Dr. Laughlin for "headache medication management," referred Plaintiff to "neuropsychology for additional cognitive testing," and stated that if Plaintiff's sleep did not improve, she would recommend an "insomnia specialist evaluation." (HART 891.)

In an attending physician statement dated February 13, 2020, Dr. Laughlin extended Plaintiff's authorization to work part-time (i.e., four hours per day and five days per week) until July 1, 2020 because of her ongoing PCS symptoms and treatment. (HART 911.) Dr. Laughlin

also reported that she did not believe that Plaintiff's PCS was a permanent disability. (HART 911.)

Dr. Laughlin completed a telephone encounter note on February 20, 2020. (HART 893.) Dr. Laughlin noted that Plaintiff reported that she "set limits on activity and did well" when "family [recently] visited from out of town," she had "ongoing issues with multiple stimuli, [and] her] vision," she was wearing her "glasses with prisms and light blocking lenses," she continued to have "decreased stamina" and "problems with executive function, multitasking, [and] light sensitivity," she needed additional time to complete tasks, she could not "tolerate [eight] hours of screen time," she needed to "limit [her] clinic time to [four to five] hours daily and limit [the number] of patients per session [and] anticipate[d] that this [would] be [the case] for another [six to twelve] months," and she had neuropsychological testing scheduled on March 8, 2020. (HART 893.)

On February 28, 2020, Plaintiff visited Cary's office for speech therapy. (HART 895.) Plaintiff informed Cary that she had a "setback in [her] PCS symptoms after [her family] trip to Disneyland in [December 2019]," even though she was "careful to use pacing strategies (e.g., sat on bench to knit [versus] going on rides)," and that she "had trouble when she got home." (HART 895.) Plaintiff added that she had experienced "[p]rogressive improvement since [returning]," she was working part-time, she noticed "some difficulty with speed processing when she ha[d] add-on/over-books patients," she continued to use a planner to help keep a schedule and maintain her pacing, she engaged in no more than two activities per day, her headaches were "apparent" after her "orofacial pain ha[d] improved" and thus she "[w]onder[ed] if she had [headaches] all along," her headaches were a "means to assess [an] appropriate activity level," she was driving occasionally in her neighborhood, she was walking half a mile twice per

day with her dog, and she occasionally needed to "look words that she knows up on Google." (HART 895.) Cary assessed that Plaintiff had "[v]ery slowly progressing PCS with continued symptoms of fatigue, slowed executive functioning, and word finding." (HART 896.) Cary recommended that Plaintiff attempt to increase her activity level and "listen to body signs for pacing," and encouraged Plaintiff to only "over-book[] on days when she has more energy[.]" (HART 895.)

On March 13, 2020, Plaintiff presented for a neuropsychological evaluation with Christopher Tongue, Ph.D. ("Dr. Tongue"). (HART 649-58.) Dr. Tongue conducted a clinical interview, reviewed a select portion of Plaintiff's medical records, and administered a battery of tests. (HART 649-56.) Dr. Tongue stated that "neuropsychological testing did not show any evidence of deficit" but Plaintiff reported a "pattern of symptoms consistent with mild uncomplicated [traumatic brain injury or 'mTBI'] following her collision with the other bicyclist, including complaints of word finding difficulty, fatigue, and headache brought on by mental effort." (HART 656-57.) Dr. Tongue also explained that Plaintiff "appear[ed] to be suffering from [PCS,] . . . a complex phenomenon which is thought to have multifactorial influences," that Plaintiff "describ[ed] what would be expected, which is a continuous pattern of improved functioning over time," that "[a]pproximately 10% of patients with mild uncomplicated TBI continue to complain of headache with mental effort and fatigue a year following the injury," and that Plaintiff "appear[ed] to be part of that 10 percent of the population of individuals who have suffered a mild uncomplicated [TBI], in this case secondary to [Plaintiff's] bicycle collision." (HART 656-57.)

Based on his evaluation, Dr. Tongue's diagnoses were PCS and "[m]ajor depressive disorder recurrent, currently in partial remission." (HART 658.) With respect to

PAGE 22 – FINDINGS AND RECOMMENDATION

recommendations, Dr. Tongue advised Plaintiff to continue participating in "individual psychotherapy with her current provider and . . . work[ing] with neuro-ophthalmology with regard to her visual disturbances," noted that it was "worth considering a referral to neurofeedback therapy as an adjunct," and stated that he "anticipate[d] that [Plaintiff] will continue to see improvement over the next [twelve] months but may experience some persistence in some symptoms such as headache with fatigue and a decrease in cognitive efficiency when fatigued." (HART 658.) Dr. Tongue added that it was "possible that [Plaintiff] may benefit from a brief consultation with psychiatry . . . with regard to pharmacologic therapy of symptoms of mood disorder," and that "[t]he issue of [Plaintiff's] medication should be discussed in the context of her recovery from mild TBI, as well as strategies for self-care so that she can increase her workload over time." (HART 658.)

In a treatment note date January 8, 2021, Nicole Ruegsegger ("Ruegsegger"), a physical therapist, noted that Plaintiff's "subjective report[s] and objective findings [were] consistent with instability of gait in the setting of [PCS]." (HART 405.) Later that same day, Dr. Laughlin observed that Plaintiff was suffering from ongoing fatigue and difficulty concentrating. (HART 407.)

During a telephone visit with Cary on January 21, 2021, Plaintiff asked questions and "complain[ed] of cognitive-linguistic changes [status post] concussion," and reported that she adjusted her "schedule to support more breaks" and she occasionally failed to "see when [she was] getting worn down," and identified "[s]ome signs of getting fatigued at work," including feeling "lost and floaty," being "easily overwhelmed with visual stimulation and sound" and "tangential in conversations," and "[t]hinking more slowly [and] focusing on small details." (HART 409.)

PAGE 23 – FINDINGS AND RECOMMENDATION

On February 18, 2021, Plaintiff informed Cary that she spent approximately two "weeks getting prepped for a craft swap with her friends . . . [and] was very wiped after[ward]," and that she was "going to be doing more virtual visits [with patients], and eliminating evening work." (HART 411.)

In a speech therapy progress report dated March 26, 2021, Cary noted that Plaintiff was "making progress toward [her] goals and ha[d] the potential to show improvement" but "[m]aximum improvement [was] yet to be attained, and there [was] an expectation that [Plaintiff would] continue to improve with [her] executive . . . and cognitive-linguistic functioning[.]" (HART 413.)

In a speech therapy progress report dated April 30, 2021, Cary noted that Plaintiff is "high-functioning at baseline" and performed within normal limits on a formal neuropsychological assessment, but "demonstrate[d] functional impairments in executive functioning, memory, word-finding/language, and attention[,] which are exacerbated by [PCS] symptoms [like] headache, fatigue, dizziness, nausea, [and] photo and phone sensitivities." (HART 416.) Cary added that Plaintiff was "making progress toward [her] therapy goals [with] use of metacognitive and compensatory strategies" but had not attained maximum improvement, Plaintiff reported "setbacks when she is not able to adequately use her strategies especially for pacing (ex: needing to work an extra day, unexpected exposure to concentrated light/sounds at [the] store)," and speech therapy "continue[d] to recommend [a] reduction in [Plaintiff's] work hours ([twenty hours per] week) if that [could] be accommodated by [her] employer and . . . family's finances." (HART 416.)

On May 3, 2021, Plaintiff participated in a video visit with Dr. Laughlin. (HART 419.) Plaintiff reported that she recently worked six days in a row but "found [that] she was not doing

PAGE 24 – FINDINGS AND RECOMMENDATION

well [the next day] and had to take [two days] off to recover," she "wonder[ed] if she should just be working [four] hour days, rather than [five] hour days," she was "not able to make decisions as well [by the end of her workdays] and ha[d] to spend quite a bit of tim[e] doing follow up and catch up," and she had an "appointment with [a] new concussion specialist in physiatry on [May 5, 2021]." (HART 419.) Dr. Laughlin observed that Plaintiff's PCS had "improved since last year, but [Plaintiff] still [had] significant problems with fatigue [and] concentration." (HART 420.)

On May 5, 2021, Plaintiff participated in a video visit with Totka Koutzeva-Dussel, M.D. ("Dr. Koutzeva-Dussel"), a physiatrist, regarding her PCS. (HART 421.) Plaintiff reported that her "main concern [was her] inability to work full time as a physician," she was "functional in the beginning of the day and as demand throughout the day increase[d], she struggle[d] with cognitive and physical performance, progressively getting worse by the end of the day," and her "executive functions suffer[ed] as the day progresse[d]." (HART 421-22.) Dr. Koutzeva-Dussel noted that based on her history and reported symptoms, Plaintiff "appear[ed] to have decreased endurance and worsening cognitive and executive function performances as the day progresses." (HART 422.) Dr. Koutzeva-Dussel also referred Plaintiff for an evaluation and to participate in the "[b]ootcamp" at the Brain Rehab Network ("BRN") "due to [her] persistent symptoms." (HART 486.)

On June 22, 2021, Plaintiff presented for an evaluation with Jennifer Cann, M.D. ("Dr. Cann"), a physiatrist at the BRN. (HART 483-92.) During the evaluation, Plaintiff reported that she continued to "experience sensory sensitivities (light [greater than] sound), headaches, dizziness/nausea, fatigue, fogginess, vision changes, impaired balance (especially at night), poor memory, poor concentration and attention, impaired executive functioning, difficulty with word

PAGE 25 – FINDINGS AND RECOMMENDATION

finding, and poor sleeps," she "no longer require[d] prism glasses," she was working five days per week and five hours per day, her "cognitive and physical performance worsen throughout the day," and her "[o]verall symptoms [were] improved, but [were] still present when [she was] cognitively or physically fatigued." (HART 486-87.) Dr. Cann assessed that Plaintiff suffered from PCS and "persistent symptoms affecting [her] ability to return to work [full-time], maintain [a] household, and engage in the community." (HART 486, 491.) Dr. Cann recommended that Plaintiff participate in four weekly "boot camp" sessions and "day-long rehab" with physical, occupational, and speech and language therapists and a neuropsychologist to "challenge [her] limitations and develop clear practice strategies for pacing and maximizing functional endurance, and noted that Plaintiff's symptoms and exam did not suggest a vestibular disturbance, but it was "[p]ossibl[e]" that she was suffering from persistent postural perceptual dizziness ("PPPD"). (HART 491-92.)

Plaintiff underwent additional evaluations at BRN later that same day, June 22, 2021. Based on her physical therapy evaluation, Amanda Hiller, P.T. ("Hiller"), determined that Plaintiff's symptoms "follow[ed] the pattern" of PPPD. (HART 498.) During an occupational therapy evaluation with Alaina Osborn, O.T. ("Osborn"), Plaintiff reported that her "biggest [current] challenge" was "[g]etting through [her] workday and being functional at the end of it," and she continued to need assistance with cooking, transportation, and shopping. (HART 500-01.) Osborn noted that Plaintiff suffered from exophoria, there were "horizontal and vertical deviations in [Plaintiff's] eye alignment which may explain or contribute to other vision impairments, headaches, fatigue, etc.," the primary assessment findings included "decreased participation in home and community activities, decreased participation in leisure pursuits, fatigue, sensory sensitivities, decreased activity tolerance, [and] vision changes," and Plaintiff

PAGE 26 – FINDINGS AND RECOMMENDATION

"performed well on assessments of executive functioning, but report[ed] difficulty with dual task, vision, and energy management, which may impact her daily functioning."[6] (HART 503-05.)

Denise Davis ("Davis"), a speech and language therapist at the BRN, described most of Plaintiff's objective measures as within normal or functional limits, and noted that Plaintiff reported "[f]atigue and increased headache . . . after completion of cognitive assessments." (HART 508-10.) Jodi Palensky, Ph.D. ("Dr. Palensky"), a psychologist at BRN, also evaluated Plaintiff and determined that Plaintiff would "benefit from short-term psychological support to assist with usage of utilization of healthy coping strategies, emotional support, and processing acceptance of any residual [PCS] challenges which may not fully resolve following treatment." (HART 516.)

In a speech therapy progress note dated July 26, 2021, Cary continued to report that Plaintiff had not attained maximal improvement, she expected that Plaintiff would "continue to improve with [her] cognitive function in response to therapy," Plaintiff continued to demonstrate functional impairments in executive functioning, memory, word-finding/language, and attention, which are exacerbated by concussion symptoms [like] headache, fatigue, dizziness, nausea, [and] photo and phono sensitivities," and Plaintiff "plan[ned] to initiate intensive rehab with [BRN]." (HART 426.)

During a video visit on August 13, 2021, Cary noted that Plaintiff was "progressing as anticipated [and] indicated by increased successful engagement with activities in the community," and recently experienced "spatial orientation issues" when she "[d]rove back from

---

[6] Exophoria is a condition in which the "eyes tend to turn out." *Perry v. Bertsch*, 441 F.2d 939, 942 (8th Cir. 1971); *see also Davis v. Apfel*, No. 00-cv-00373-FR, 2000 WL 1721144, at *1 (D. Or. Oct. 24, 2000) (noting that the claimant suffered from "left exophoria, a condition in which the left eye turns outward and does not focus in conjunction with the right eye").

PAGE 27 – FINDINGS AND RECOMMENDATION

downtown" and "accidentally got on the [highway]" after "turn[ing] around to go back." (HART 429-30.) Plaintiff also reported that after a recent walk, she suffered from a worsening headache. (HART 430.)

During a video visit on August 25, 2021, Dr. Laughlin noted that Plaintiff continued to suffer from PCS-related symptoms, including difficulty concentrating, ongoing photosensitivity, and "[n]ausea/vertigo with even short care rides," "high-functioning patients may have normal testing, but still have difficulty with decision-making, especially when fatigued," and she "agree[d]" with Dr. Koutzeva-Dussel's decision to refer Plaintiff to BRN for treatment. (HART 340-41.)

## DISCUSSION

The parties cross-move for judgment on the administrative record, pursuant to Rule 52(a). (Def.'s Mot. J. ("Def.'s Mot.") at 23, ECF No. 17; Pl.'s Mot. J. ("Pl.'s Mot.") at 32, ECF No. 18.) The parties' motions turn on whether Defendant correctly denied Plaintiff's claim for LTD benefits. (Def.'s Mot. at 2-3; Pl.'s Mot. at 3, 21, 32.) As explained below, the Court finds that Defendant incorrectly denied Plaintiff's LTD claim, and thus recommends that the district judge grant Plaintiff's motion for judgment and deny Defendant's motion for judgment.

## I.    STANDARD OF REVIEW

The parties agree that de novo review applies to Defendant's denial of Plaintiff's LTD claim. (*See* Def.'s Mot. at 23, reflecting that Defendant does not dispute that de novo review applies; Pl.'s Mot. at 4, stating that de novo review applies). Consistent with the parties' agreement, the Court reviews de novo Defendant's denial of LTD benefits. *See Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1186, 1188 (9th Cir. 2022) (applying and providing clarification regarding the de novo review standard under ERISA, and observing that "[i]n the district court, the parties agreed that de novo review applied . . . and that [was] the standard the

PAGE 28 – FINDINGS AND RECOMMENDATION

[district] court applied"); *Veronica L. v. Metro. Life Ins. Co.*, 647 F. Supp. 3d 1028, 1037 (D. Or. 2022) (explaining that district "courts may accept parties' stipulation to de novo review" and accepting such a stipulation (citing *Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009))).

"When a district court reviews de novo a plan administrator's determination of a claimant's right to recover [LTD] benefits, the claimant has the burden of proving by a preponderance of the evidence that he was disabled under the terms of the plan." *Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162-63 (9th Cir. 2016) (citing *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010)). In evaluating whether the claimant has met her burden of proving disability, the district court "examines the administrative record without deference to the administrator's conclusions to determine whether the administrator erred in denying benefits." *Collier*, 53 F.4th at 1182 (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) and *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)); *see also id.* at 1186 (noting that on de novo review, "the court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits") (simplified).

Notably, "[t]he district court's task is to determine whether the plan administrator's decision is supported by the [administrative] record, not to engage in a new determination of whether the claimant is disabled." *Id.* at 1182. Consequently, "the district court must examine only the rationales the plan administrator relied on in denying benefits and cannot adopt new rationales that the claimant had no opportunity to respond to during the administrative process." *Id.* A district court commits reversible error if it "adopt[s] post-hoc rationalizations that were not presented to the claimant, including credibility-based rationalizations, during the administrative

PAGE 29 – FINDINGS AND RECOMMENDATION

process." *Id.* at 1182, 1188 (citing *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719-21 (9th Cir. 2012)).

## II.    ANALYSIS

On de novo review, the Court accords no deference to Defendant's decision in evaluating whether it correctly denied Plaintiff's claim for LTD benefits. As explained below, the Court finds the record does not support Defendant's decision and that Defendant incorrectly denied Plaintiff's claim for LTD benefits, and therefore recommends that the district judge grant Plaintiff's motion for judgment on the record and deny Defendant's motion for judgment on the record.

### A.    Preliminary Matters

Before addressing the parties' primary arguments, the Court briefly discusses the terms of the LTD plan and the administrative process, including the grounds on which Defendant denied Plaintiff's claim. *See generally id.* at 1187-88 (focusing on the grounds the defendant raised for denying the plaintiff's LTD claim in the initial letter and denial letter of the plaintiff's internal appeal).

#### 1.    The LTD Plan

##### a.    Disability Benefit Eligibility

In the "Benefits" section, the LTD plan provides that claimants are entitled to benefits if they (1) "become Disabled while insured under [the plan]," (2) "are Disabled throughout the [180-day] Elimination Period," (3) "remain Disabled Beyond the [180-day] Elimination Period," and (4) "submit Proof of Loss to [Defendant]."[7] (PLAN 9, 14) (bold and all caps omitted). In the

---

[7] It appears that the 180-day elimination period ran from March 18, 2019 (the day of Plaintiff's accident and date of disability) through September 13, 2019 (the day before the LTD benefit effective date and LTD benefits would normally begin). (*Compare* HART 3, 28-29, 572, listing Plaintiff's "DOD" or "[d]ate of [d]isability" as March 18, 2019, the elimination period as

PAGE 30 – FINDINGS AND RECOMMENDATION

"Definitions" section, the LTD plan provides that "Disability or Disabled" means that the claimant cannot "perform[] one or more of the Essential Duties of (1) Your Occupation during the Elimination Period; and (2) Your Occupation following the Elimination Period, and as a result Your Current Monthly Earnings are less than [eighty percent] of Your Indexed Pre-disability Earnings." (PLAN 24) (bold and all caps omitted). The LTD plan adds that any "[d]isability must result from," among other things, an "accidental bodily injury" or "sickness." (PLAN 25.)

As discussed below, the parties dispute whether Plaintiff proved that she was disabled throughout and beyond the 180-day elimination period. (*See* Def.'s Mot. at 2-3, 24-27.) It is undisputed, however, that as a result of the bike accident on March 18, 2019, Plaintiff suffered bodily injuries (maxillary fracture and mTBI) and "carries the diagnosis of PCS." (Def.'s Mot. at 4; Def.'s Reply Supp. Mot. J. ("Def.'s Reply") at 4, ECF No. 22.) It is also undisputed that Plaintiff's LTD claim is based on her bike "accident resulting in a maxillary fracture [and] residual [PCS] symptoms[,] including fatigue, photophobia, headaches, and depression." (HART 101, 121.)

Additionally, the parties do not appear to dispute that at all relevant times, Plaintiff's occupation was a family medicine physician (HART 121); the essential duties of Plaintiff's

---

"180 days," and the LTD "BED" or "[b]enefit effective date" as September 14, 2019, *with* HART 121, reflecting that Defendant informed Plaintiff that "[a]fter the 180 day Elimination period, . . . if [she met] the provisions of the policy, LTD benefits would normally start on [September 14, 2019]," *and* HART 24, 120, stating that LTD "[b]enefits accrue as of the first day after the Elimination Period," *and* HART 388, 393, 568, 611, 626, 935, showing that Defendant's referral questions focused on whether Plaintiff was disabled from March 18, 2019 through September 13, 2019, and September 14, 2019 to present; *but cf.* Def.'s Mot. at 2, 10, 24, referring to the 180-day elimination period as "March 18, 2019 to September 14, 2019" and "March 18, 2019 to September 15, 2019"; Pl.'s Resp. Def.'s Mot. ("Pl.'s Resp.") at 3 n.1, ECF No. 21, stating that the 180-day elimination period ran from March 17, 2019 through September 13, 2019).

PAGE 31 – FINDINGS AND RECOMMENDATION

occupation included her ability to "work the number of hours in [her] regularly scheduled work week," i.e., forty hours per week (HART 120, quoting PLAN 25; STD AR 7, 26-27; Pl.'s Mot. at 8 n.2); and Plaintiff's current monthly earnings were less than eighty percent of her indexed pre-disability earnings ("PDE"). (*See* Pl.'s Mot. at 4 n.1, noting Plaintiff's uncontested representation about why she satisfies the LTD plan's earning requirements; HART 19, 101, showing that on July 13, 2021 and in its final denial letter dated September 24, 2021, Defendant noted that Plaintiff gradually increased her hours to and "continue[d] to work" twenty-five hours per week, not full-time; STD AR 2-10, reflecting that on September 10, 2019, Plaintiff informed Defendant that she had returned to "work[ing] at 60% instead [of] 100%" of her PDE, and that at times, Plaintiff received her "full pay" based on "the combination of her worked hours and sick time" or "PTO").[8]

### b.    Proof of Loss and Regular Care of a Physician

Under the LTD plan, a claimant's entitlement to benefits (and any continued payment of benefits) also turns on whether she submits sufficient "Proof of Loss" to Defendant and remains under the "Regular Care of a Physician." For example, the LTD plan provides that it "does not cover, and [Defendant] will not pay a benefit for any Disability . . . unless [the claimant is] under the Regular Care of a Physician," and that "[b]enefit payments will stop" on the date that the claimant is "no longer under the Regular Care of a Physician[.]" (PLAN 16, 19.) The LTD plan further provides that the claimant must submit "Proof of Loss" to Defendant, which "may include but is not limited to . . . evidence that [the claimant is] under the Regular Care of a

---

[8] The record suggests that Plaintiff did not always satisfy the STD plan's Disabled and Working earning requirements during the twenty-five week STD benefit period (i.e., a benefit effective date of March 25, 2019 and a benefit end date of September 15, 2019), but Defendant otherwise approved Plaintiff's STD claim and Plaintiff qualified for such benefits until the STD benefit period ended on September 15, 2019. (*See* Def.'s Mot. at 2, 7-10; Pl.'s Mot. at 1-2, 21; Pl.'s Resp. at 4; Def.'s Reply at 7; STD AR 2-10, 24, 42, 87; STD PLAN 5, 7-8, 11; HART 28, 137, 140.)

Physician[.]" (PLAN 14, 20.) The LTD plan defines "Regular Care of a Physician" as met by a physician who is not the claimant or related to the claimant "by blood or marriage"; whose "medical training and clinical experience are suitable to treat [the claimant's] disability condition"; and whose treatment is "consistent with the diagnosis of the disabling condition," "according to guidelines established by medical, research, and rehabilitative organizations," and "administered as often as needed . . . to achieve the maximum medical improvement." (PLAN 26-27.)

As discussed below, Defendant maintains that Plaintiff failed to meet her burden of proving that she was under the regular care of a physician for a ten-month period from March 13, 2019 (the day of Dr. Tongue's neuropsychological evaluation) through January 8, 2021 (the day that Plaintiff presented for physical therapy with Ruegsegger). (*See* Def.'s Mot. at 2, 18, 24, 27-28.)

### 2. The Administrative Process

#### a. Defendant's Initial Consultants' File Review

On August 13, 2020, Defendant referred its review of Plaintiff's LTD claim to Katherine Herzog, M.D. ("Dr. Herzog"), a physician who is board certified in physical medicine and rehabilitation, pain medicine, and brain injury medicine, and Glen Getz, Ph.D. ("Dr. Getz"), a licensed psychologist and board certified clinical neuropsychologist. (HART 584-85, 619-21, 638, 643.)

In letters dated August 28, 2020, Drs. Herzog and Getz informed Dr. Laughlin that they had reviewed Plaintiff's LTD-related medical records and needed Dr. Laughlin to answer certain questions to assist with their assessments of Plaintiff's functional abilities. (HART 584-85, 619-21.)

///

PAGE 33 – FINDINGS AND RECOMMENDATION

On September 8, 2020, Dr. Laughlin responded to Dr. Herzog's three questions. (HART 619-21.) Responding to Dr. Herzog's first question about the date of Plaintiff's last in-person medical visit and recovery status at that time, Dr. Laughlin explained that Plaintiff appeared for an in-person visit with Dr. Mirchandani, a physiatrist, on February 5, 2020, and Plaintiff "continued to have fatigue, decreased stamina, slower executive function, word finding difficulties, headaches, difficulty concentrating, and hypersomnia." (HART 620.) Responding to Dr. Herzog's second question about whether Plaintiff received treatment after February 28, 2020, Dr. Laughlin cited a total of five telephone or video visits from July and August 2020, which were for speech therapy, physiatry follow-up, occupational therapy, and physical therapy. (HART 620.) Dr. Laughlin added that "[b]ecause of the pandemic, all [medical] departments [were] trying to minimize in-person follow up appointments." (HART 620.) Responding to Dr. Herzog's third and final question, Dr. Laughlin stated that she could not "provide further insight" on Plaintiff's reports about driving, which, according to Dr. Herzog, were inconsistent. (HART 620.)

On September 14, 2020, Dr. Herzog submitted a summary of her findings and conclusions to Defendant. (HART 603-14.) Dr. Herzog noted that Plaintiff alleged a disability onset date of March 18, 2019 and carried primary diagnoses of PCS, left peripheral vertigo, and maxillary fracture, and that consistent with Defendant's consultation referral, she assessed the "presence/absence of impairment and . . . any restrictions and/or limitations" that were "within the realm" of physical medicine and rehabilitation and pain medicine and "present for the timeframe of [March 18, 2019 through September 13, 2019] and [September 14, 2019 through July 1, 2020]." (HART 603, 614.) Based on her review of Plaintiff's medical records, Dr. Herzog determined that Plaintiff did "have impairment of the severity that would preclude her from

PAGE 34 – FINDINGS AND RECOMMENDATION

functioning outside of basic activities of daily living" from March 18, 2019 through May 14, 2019, but Plaintiff's "documentation [did] not support any restrictions and/or limitations" from May 15, 2019 through September 13, 2019 and September 14, 2019 through July 1, 2020. (HART 603.)

Dr. Herzog explained that she evaluated Plaintiff's records from "a physical functional standpoint," and that Dr. Stelmack appropriately determined that Plaintiff was unable to work from March 18, 2019 through May 5, 2019 but an extension to May 14, 2019 was necessary because Plaintiff did not have her initial speech therapy visit with Cary until April 29, 2019 and Cary addressed compensatory strategies with Plaintiff during the follow-up visit on May 14, 2019. (HART 611-12.) With respect to the remaining time period of May 15, 2019 through July 1, 2020, Dr. Herzog determined that "the documentation [did] not support any restrictions and/or limitations." (HART 612.) In support, Dr. Herzog emphasized that although Plaintiff "continued to report symptoms," Plaintiff's visits with Dr. Laughlin on July 25, August 23, November 18, and December 23, 2019 and February 27, 2020 "were only telephone visits, did not include physical exams and no changes to treatment occurred," which "resulted in [Dr. Herzog's] opinion that [Plaintiff's] condition was stable." (HART 612.) Dr. Herzog added that (1) Plaintiff's post-May 14, 2019 speech therapy and occupational therapy visits were limited and "sparse," (2) Plaintiff did not follow up with Dr. Stelmack or trial a medication Dr. Stelmack recommended, which led Dr. Herzog to "opine that [Plaintiff] was stable,"[9] (3) the post-February 28, 2020 treatment visits that Dr. Laughlin described in her response letter were "not available to review," (4) Plaintiff appeared for a physiatry follow-up on February 5, 2020 but

---

[9] In late August 2020, a month before Dr. Herzog issued her opinion, Defendant learned that Dr. Stelmack no longer worked at Plaintiff's clinic because he retired, and the physiatrist "who [was] taking over care for [Plaintiff was] also leaving the facility on [August 31, 2020]." (HART 60-61.)

PAGE 35 – FINDINGS AND RECOMMENDATION

Dr. Mirchandani's exam was "essentially normal" outside of the "[l]oss of balance with tandem stance," which "alone [did] not support an impairment that would require restriction and/or limitations," and (5) Dr. Laughlin's February 20, 2020 telephone encounter note and September 8, 2020 response letter failed to reflect that Plaintiff followed up with Dr. Laughlin regarding headache medication management, as Dr. Mirchandani had recommended. (HART 612.)

Additionally, Dr. Herzog's report reflects that on two occasions, she noted that "[g]iven the diagnoses of disorder of refraction, binocular vision disorder, photophobia and convergence insufficiency, [Plaintiff's] case also need[ed] to be reviewed by a [n]euro-[o]phthalmologist." (HART 603, 611.)

Also on September 14, 2020, Dr. Getz submitted a summary of his findings and conclusions to Defendant. (HART 622-28.) Consistent with Defendant's referral, Dr. Getz focused on the same time periods as Dr. Herzog and limited his opinions and analysis to his area of expertise (psychology and neuropsychology) and "a cognitive perspective" regarding Plaintiff's symptoms and impairments. (HART 622-23, 626, 628.) Dr. Getz determined that Plaintiff's medical records did not "substantiate severe observed or quantified cognitive symptoms and impairment in function sufficient to limit work activity from [March 18, 2019 through September 13, 2019,] as well as [September 14, 2019] through [July 1, 2020]." (HART 622, 626.) In support, Dr. Getz emphasized that although Plaintiff "endorsed experiencing cognitive symptoms, including difficulties with attention, multitasking and word finding, . . . she was consistently assessed as having normal mental status examinations[.]" (HART 622-23.) Dr. Getz added that during Cary's speech language pathology assessment on April 29, 2019, Plaintiff's "results were entirely intact with 100 [percent] accuracy in a number of domains." (HART 627.)

PAGE 36 – FINDINGS AND RECOMMENDATION

Furthermore, Dr. Getz observed that during Plaintiff's neuropsychological evaluation on March 13, 2020, Dr. Tongue administered two tests that included their own "embedded measure[] of performance validity" (i.e., the digit span portion of the Wechsler Adult Intelligence Scale-IV and the failure to maintain set aspect of the Wisconsin Card Sorting Test), and a test that "contain[ed] several symptom validity scores embedded within the measure" (i.e., the Personality Assessment Inventory). (HART 627-28, 653-57.) Dr. Getz explained that "the interpretation of [Dr. Tongue's] evaluation results as being valid [was] called into question" because Dr. Tongue's "evaluation did not include any stand-alone performance measures or a sufficient number of embedded performance validity measures to be consistent with neuropsychology industry standards examining effort." (HART 627.) Dr. Getz, however, stated that Dr. Tongue's evaluation "still revealed performance that fell between the average and exceptionally high ranges," which is "inconsistent with an individual experiencing severe quantified cognitive symptoms and impairment in function sufficient to limit work activity." (HART 627.)

Finally, Dr. Getz observed that Plaintiff's "prognosis [was] good" because "formal neuropsychological testing was intact" and Plaintiff "demonstrated strong cognitive abilities on formal testing and there [was] no evidence [to] substantiate cognitive impairment." (HART 628.) Dr. Getz added that Plaintiff reported "experiencing headaches and fatigue after engaging in activities . . . [that] affect[ed] aspects of her cognitive functioning" but "[o]pinions regarding improvement in physiological symptoms . . . [were] outside the scope of [his] area of expertise." (HART 628.)

On September 24, 2020, Dr. Laughlin responded to Dr. Getz's five questions. (HART 584-85.) Responding to Dr. Getz's first, second, and third questions about quantified cognitive

PAGE 37 – FINDINGS AND RECOMMENDATION

deficits, Dr. Laughlin explained that she believed that Plaintiff suffered from cognitive deficits and cited Plaintiff's self-reports and the assessment that Dr. Mirchandani, a physiatrist who "specializ[es] in head injuries and post-concussion care," completed on July 31, 2020. (HART 584-85.) Responding to Dr. Getz's fourth question about functional abilities, Dr. Laughlin explained that Plaintiff can work five "hours daily but has ongoing decreased functional capacity and stamina," Plaintiff is "easily fatigued with higher cognitive function which results in slower processing times, difficulty with word finding[,] and decreased executive functioning," Plaintiff has "headaches, nausea[, and] visual disturbance [with] prolonged mental activity," Plaintiff is "irritab[le] when fatigued," and Plaintiff should "continue[] occupational, speech[, and] physical therapy." (HART 585.) Responding to Dr. Getz's fifth and final question, Dr. Laughlin explained that although she was not aware of "any formal assessment of exaggeration or over-reporting of symptoms" in Plaintiff's case, Plaintiff was "doing her utmost to return to work and function professionally, even at the expense of her personal life outside work." (HART 585) (bold omitted).

In an addendum dated October 6, 2020, Dr. Getz reported that he reviewed Dr. Laughlin's responses and "the additional information . . . [did] not alter [his] opinion." (HART 568-69.)

### b.    Defendant's Initial Denial Letter

In a letter dated October 6, 2020, Defendant denied Plaintiff's claim for LTD benefits. (HART 119-24.) Defendant explained that based on "the combination of all the medication information in [Plaintiff's] file," Defendant concluded that Plaintiff was "able to sit sporadically, stand for a majority of the day, walk for the majority of the day, lift up to [twenty] pounds occasionally, frequently use fingers for fine manipulation, frequently use hands for gross manipulation, occasionally reach above shoulder level, and frequently reach below shoulder

PAGE 38 – FINDINGS AND RECOMMENDATION

level." (HART 122.) Defendant also explained that it "compared this information" to the essential duties of Plaintiff's occupation as a family medicine physician, and found that Plaintiff was "able to perform these duties as of [September 14, 2019]." (HART 122.) Defendant added that because the "combined information" in Plaintiff's file failed to demonstrate that she was unable to perform the essential duties of her occupation on a full-time basis as of September 14, 2019 (the benefit effective date), Defendant "must deny [Plaintiff's] claim for LITD benefits." (HART 122.)

### c.      Defendant's Appeal Consultants' File Review

After Defendant received Plaintiff's notice of intent to appeal on July 1, 2020 and additional records, Defendant referred its review of Plaintiff's appeal to Kevin Kohan, D.O. ("Dr. Kohan"), a physician board certified in physical medicine and rehabilitation/pain medicine, and Gabriel Jasso, Psy.D. ("Dr. Jasso"), a licensed psychologist and neuropsychologist. (HART 4, 385-96.)

In a combined report dated August 30, 2021, Drs. Kohan and Jasso summarized their findings and conclusions. (HART 385-96.) Dr. Kohan noted that Plaintiff's "medical history [was] significant for maxillary fracture with residual post-concussion symptoms including fatigue, photophobia, headaches, and depression," and Plaintiff carried diagnoses of "concussion, right maxillary fracture, and contusion" following her bicycle accident with "loss of consciousness" on March 18, 2019. (HART 388-89.) Dr. Kohan explained that although Plaintiff had been "experiencing sensory sensitivities, headaches, dizziness/nausea, fatigue, fogginess, vision changes, impaired balance, poor memory, poor concentration, and [poor] attention" post-accident, he was "unable to find support for a physical impairment as [Plaintiff had] no neurological deficit with no motor loss, no sensory loss, no significant alteration in reflexes, [and] no loss of gait/mobility," and "[p]hysical exam findings indicate[d] full strength, full range

PAGE 39 – FINDINGS AND RECOMMENDATION

of motion, and normal gait." (HART 389.) Dr. Kohan added that Plaintiff's medical records "mostly focused on [her] cognitive conditions, which [he] deferred to the appropriate specialty as they [were] outside of the scope of [his] report." (HART 389.) Dr. Kohan found that "no activity restrictions [were] supported for the time period of [March 23, 2019] to [September 13, 2019] and from [September 14, 2019] to current," and Plaintiff required "short [term] total restriction from [March 18, 2019] to [March 22, 2019] for work-up and hospital follow-up [post-bike] accident." (HART 389.)

Dr. Jasso similarly explained that although Plaintiff had "a medical history significant for [PCS], major depressive disorder, [and] general anxiety disorder" and "symptoms consistent with [PCS]" following her bicycle accident on March 18, 2019, Plaintiff did "not have psychiatric/cognitive impairments that translate[d] into restrictions and limitations from [March 18, 2019] to [September 13, 2019] and from [September 14, 2019] to the present." (HART 393.) In support, Dr. Jasso noted, among other things, that Plaintiff was "evaluated by multiple speech-language pathologists who appreciated no speech abnormalities and [were] unable to quantify or appreciate her other reported cognitive deficits with objective assessment," and Dr. Tongue's "neuropsychological evaluation . . . revealed no cognitive or mood impairments in any way." (HART 394.) After noting that Plaintiff was "significantly disabled for a short while" after her "significant accident that caused loss of consciousness," Dr. Jasso explained that Plaintiff "report[ed] that her symptoms [were] associated with fatigue" but given "the lack of measurable findings to support the reported claims despite multiple assessments, [Plaintiff could not] be considered to have any cognitive impairments limiting her function [and] should be assessed more on the effects of fatigue, which [he] defer[red] to the appropriate specialty reviewers." (HART 394.)

PAGE 40 – FINDINGS AND RECOMMENDATION

In addenda dated September 13, 2021, Drs. Kohan and Jasso confirmed that they reviewed Dr. Laughlin's video visit note dated August 25, 2021, which reflected that Plaintiff was seen for "[PCS], difficulty concentrating, and ongoing photosensitivity." (HART 255-56, 340-42.) Dr. Kohan noted that Dr. Laughlin's recent observations did "not alter [his] prior opinion," as "[n]o physical exam was noted." (HART 255.) Dr. Jasso likewise concluded that Dr. Laughlin's recent visit did not "alter [his] prior opinion." (HART 256.) Dr. Jasso noted that Dr. Laughlin reported that Plaintiff "still experience[d] poor concentration related to her condition," explained that "neuropsychological testing may be normal in high-functioning individuals, despite difficulties with decision-making especially when fatigued," and offered an "objective assessment of [Plaintiff] . . . in [the] documentation." (HART 256.) Nevertheless, Dr. Jasso found that there were "no findings indicating the presence of cognitive deficits in the document presented, despite the continuous complaints of impairments in concentration[.]" (HART 256.)

### d.    Defendant's Final Denial Letter

On September 24, 2021, Defendant upheld its initial decision to deny Plaintiff's claim for LTD benefits. (HART 101-04.) In its final denial letter, Defendant summarized the procedural history, the records it considered, and its medical consultants' primary opinions. (HART 101-03.) After doing so, Defendant explained that "[t]he question at hand [was] whether the medical information support[ed] limitations precluding [Plaintiff] from [her] occupation through and beyond the Elimination Period," and "[a]s noted in [its medical consultants'] reports, the available medical [information] does not support limitations through and beyond the Elimination Period." (HART 103.) Defendant added that "[b]ecause of this, the denial of [Plaintiff's] claim [was] considered appropriate" and the "above analysis represent[ed] [its] final decision[.]" (HART 103.)

PAGE 41 – FINDINGS AND RECOMMENDATION

### B.    Disposition

#### 1.    Plaintiff's Burden and Defendant's Decision

The parties' primary dispute turns on whether Plaintiff has met her burden of proving by a preponderance of the evidence that she was disabled under the terms of the LTD plan. (*See* Def.'s Mot. at 2, 24-28, arguing that Plaintiff has not met her burden; Pl.'s Resp. 3, disputing whether Plaintiff has met her burden). As explained below, the Court finds that Plaintiff satisfied her burden here.

The record establishes that on March 18, 2019, Plaintiff was involved in a "significant [bicycle] accident that caused loss of consciousness and left [Plaintiff] significantly debilitated for [a dispute period of time]." (HART 394.) The record also establishes that as a result of this significant accident, Plaintiff suffered a broken jaw and mTBI, carried the diagnosis of PCS, and complained of symptoms consistent with PCS, including, but not limited to, fatigue, decreased stamina, and headaches. (*See* HART 385, 387-89, Dr. Kohan noted that Plaintiff's medical history was significant for "maxillary fracture with residual [PCS] symptoms including fatigue" and Plaintiff had been "experiencing sensory sensitivities, headaches, dizziness/nausea, fatigue, fogginess, vision changes, impaired balance, poor memory, poor concentration, and [poor] attention"; HART 393-94, Dr. Jasso described the accident as "significant," noted that Plaintiff reported headaches and fatigue, "which are consistent with [PCS]," and stated that Plaintiff "should be assessed more on the effects of fatigue, which [Dr. Jasso] defer[red] to the appropriate specialty reviewers"; HART 656-57, Dr. Tongue noted that Plaintiff "appear[ed] to be suffering from [PCS]" and reported a "pattern of symptoms consistent with mild uncomplicated TBI . . . , including complaints of word finding difficulty, fatigue, and headache brought on by mental effort"; HART 620, Dr. Laughlin cited PCS symptoms of fatigue and decreased stamina).

PAGE 42 – FINDINGS AND RECOMMENDATION

The record further establishes that as a result of Plaintiff's accident, ongoing PCS symptoms, and treatment records, Plaintiff's primary care physician, Dr. Laughlin, determined that Plaintiff was unable to work forty hours per week/full-time (i.e., an essential duty) as a family medicine physician throughout and beyond the elimination period (i.e., March 18, 2019 to September 13, 2019 and beyond). (*See* STD AR 108, placing Plaintiff off work from March 18, 2019 through May 19, 2019, and on modified activity at work and home from May 20, 2019 through June 2, 2019, and recommending that Plaintiff work no more than four "hours per day, [four] days a week" from May 20, 2019 through June 2, 2019; HART 911, extending Plaintiff's authorization to work part-time from May 20, 2019 through July 1, 2020 because of her ongoing PCS symptoms and treatment; *see also* HART 585, reflecting that as of September 24, 2020, Plaintiff was limited to part-time work because she was "easily fatigued with higher cognitive function" and suffered from "ongoing decreased functional capacity and stamina"; HART 419, May 3, 2021, noting "significant problems with fatigue"; HART 340-41, August 25, 2021, noting that Plaintiff had ongoing PCS symptoms and needed "another letter for the next [six] months limit[ing] her work hours to [five] hours daily," and agreeing with the BRN referral; HART 101, acknowledging that Plaintiff did not increase her work hours to more than twenty-five per week).

Plaintiff's other treating and examining medical providers' findings and observations are largely consistent with and captured by Dr. Laughlin's opinions regarding Plaintiff's inability to work full-time throughout and beyond the elimination period. The record includes numerous examples:

- On March 26, 2019, Dr. Stelmack, a physiatrist, noted that Plaintiff's primary diagnosis was sequela of a TBI (i.e., PCS, a mild cognitive impairment, and ataxia). (HART 788-98.)

- On April 8, 2019, Chaimov, an occupational therapist, listed PCS as Plaintiff's diagnosis and visual disturbance and nausea as secondary diagnoses, and stated that Plaintiff's "subjective report[s] and objective findings [were] consistent with visual sensitivity including light sensitivity, impaired reading and screen use, fatigue, impaired concentration and processing speed, [and] concerns for convergence insufficiency status post-concussion." (HART 800-06.)

- On April 11, 2019, Dr. Stelmack observed that during his neurological examination, Plaintiff exhibited a "slight skew" and esophoria in her right eye and a Dix-Hallpike test "produce[d] vertigo and brief nystagmus [that was] left ear dependent." (HART 813.) Dr. Stelmack's impression was PCS with "photophobia, peripheral vertigo, fatigue[,] and [an] eye movement [disorder] with reduced screen time/reading time." (HART 813.)

- On April 17, 2019, Woodell, a physical therapist, noted that Plaintiff's subjective reports and objective findings were consistent with PCS. (HART 816.)

- On May 21, 2019, Dr. Muraki explained that during her eye examination, Plaintiff exhibited "[c]onvergence insufficiency," a "[n]arrow fusion range at near," and "[p]oor vergence facility," which, according to Dr. Muraki, were "[l]ikely contributors to [Plaintiff's] decreased interest in reading, [and]

PAGE 44 – FINDINGS AND RECOMMENDATION

provocation of headache and fatigue after sustained near activity." (HART 849.)

- In a speech therapy note dated August 14, 2019, Cary assessed that Plaintiff was suffering from "slowly resolving [PCS]," emphasized that Plaintiff's "[s]peech and cognition appear[ed] grossly [within normally limits], but may be impacted by other [PCS] symptoms such as fatigue, pain, stress, [and] cognitive overload," and encouraged Plaintiff to "continue pacing" and working with occupational therapy on her PCS. (HART 861-62.)

- On February 5, 2020, Dr. Mirchandani, a physiatrist, documented decreased reflexes and "[l]oss of balance with tandem stance," and stated that Plaintiff's "poor sleep and stress [were] likely confounding her [PCS] symptoms[.]" (HART 889-91.)

- In speech therapy note dated February 28, 2020, Cary noted that Plaintiff had a "setback in [her] PCS symptoms after [a family] trip" in December 2019, assessed that Plaintiff had "[v]ery slowly progressing PCS with continued symptoms of fatigue, slowed executive functioning, and word finding," recommended that Plaintiff attempt to increased her activity level and "listen to body signs for pacing," and encouraged Plaintiff to only "over-book[] on days when she has more energy[.]" (HART 895-96.)

- On March 13, 2020, after conducting a clinical interview, reviewing a portion of Plaintiff's medical records, and administering a battery of tests, Dr. Tongue, an examining neuropsychologist, explained that although Plaintiff's "neuropsychological testing did not show any evidence of deficit,"

PAGE 45 – FINDINGS AND RECOMMENDATION

Plaintiff reported a "pattern of symptoms consistent with [mTBI] . . . , including complaints of word finding difficulty, fatigue, and headache brought on by mental effort," Plaintiff "appear[ed] to be suffering from [PCS,] . . . a complex phenomenon which is thought to have multifactorial influences," Plaintiff "describ[ed] what would be expected [in a mTBI case], which is a continuous pattern of improved functioning over time," that "[a]pproximately [ten percent] of patients with mild uncomplicated TBI continue to complain of headache with mental effort and fatigue a year following the injury," and Plaintiff "appear[ed] to be part of that [ten] percent of the population of individuals who have suffered a mild uncomplicated [TBI]." (HART 649-58.)

- On January 8, 2021, Ruegsegger, a physical therapist, noted that Plaintiff's "subjective report[s] and objective findings [were] consistent with instability of gait in the setting of [PCS]." (HART 405.)

- On April 30, 2021, Cary noted that Plaintiff "demonstrate[d] functional impairments in executive functioning, memory, word-finding/language, and attention[,] which are exacerbated by [PCS] symptoms [like] headache, fatigue, dizziness, nausea, [and] photo and phono sensitivities," Plaintiff's setbacks were related to insufficient pacing, and speech therapy "continue[d] to recommend [a] reduction in [Plaintiff's] work hours ([twenty hours per] week)[.]" (HART 416.)

- On May 5, 2021, Dr. Koutzeva-Dussel, a physiatrist, stated that Plaintiff "appear[ed] to have decreased endurance and worsening cognitive and

PAGE 46 – FINDINGS AND RECOMMENDATION

executive function performances as the day progresses," and referred Plaintiff to BRN. (HART 422, 486.)

- During initial evaluations at BRN on June 22, 2021, Dr. Cann, a physiatrist, noted that Plaintiff may be suffering PPPD, and Hiller, a physical therapist, stated that Plaintiff's symptoms "follow[ed] the pattern" of PPPD. (HART 491-92, 498.) Osborn, an occupational therapist, also noted that Plaintiff suffered from exophoria and there were "horizontal and vertical deviations in [Plaintiff's] eye alignment which may explain or contribute to other vision impairments, headaches, fatigue, etc." (HART 503-05.) Davis, a speech and language pathologist, added that Plaintiff complained of "[f]atigue and increased headache . . . after completion of cognitive assessments." (HART 508-10.)

The opinions of Plaintiff's treating and examining medical providers (Dr. Laughlin, in particular) are persuasive evidence that she is disabled under the terms of the LTD plan. In *Rabbat v. Standard Insurance Co.*, 894 F. Supp. 2d 1311, 1313-14, 1320 (D. Or. 2012), the district court similarly found that the plaintiff's opinions from internists who "personally examined and treated him . . . alone [was] persuasive evidence that [he was] totally disabled." *Id.* In support, the district court noted that "evidence showing that the doctors who personally examined the claimant concluded that he was disabled, even though the insurance company's non-examining physicians found otherwise, supported finding that the claimant was disabled under terms of the plan[.]" *Id.* (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-79 (9th Cir. 2011))).

///

PAGE 47 – FINDINGS AND RECOMMENDATION

Notably, Defendant's medical consultants only conducted pure-paper file reviews of Plaintiff's LTD claim. (HART 255-56, 385-96, 568-69, 603-14, 622-28.) Courts have viewed pure-paper file reviews with a measure of skepticism and as minimally persuasive. *See Sund v. Hartford Life & Accident Ins. Co.*, No. 21-cv-05218, 2023 WL 5181624, at \*14, \*18 (N.D. Cal. Aug. 11, 2023) (applying the de novo standard of review in an ERISA case and explaining that "the Ninth Circuit has viewed pure paper reviews with some skepticism") (simplified); *Renzi v. Aetna Life Ins. Co.*, No. 18-cv-01041, 2019 WL 3243619, at \*1-2, \*12-13 (C.D. Cal. July 12, 2019) (applying the de novo standard of review in an ERISA case and collecting cases in support of the court's determination that it had "reason to view [the defendant's consultant's] report with a measure of skepticism as compared to the reports of [the plaintiff's] treating physicians") (citations omitted); *see also Goodman v. First Unum Life Ins. Co.*, No. 2:21-cv-00902, 2023 WL 3224481, at \*8-10 (W.D. Wash. May 3, 2023) (applying de novo review in an ERISA case and concluding that the defendant's "reliance on a 'pure paper' review of [the plaintiff's] medical condition [was only] minimally persuasive").

This Court likewise finds Defendant's medical consultants' reports only minimally persuasive. The Court notes that the record falls well short of supporting Drs. Kohan and Jasso's combined opinion that on and after March 23, 2019, Plaintiff could work full-time as a family medicine physician. (*See* HART 255-56, 389, 393, 396.) In addition to the observations below that apply equally to all of Defendant's consultants' opinions, the Court views Drs. Kohan and Jasso's opinions with skepticism given that (1) on March 18, 2019, Plaintiff was involved in a "significant accident" that resulted in a loss of consciousness, mTBI, "quite a bit of amnesia," a fractured jaw, and Plaintiff needing to be "[k]ept overnight for observation," her jaw "reset," and her teeth "splinted with ortho wire" for "stability," (2) Plaintiff's post-hospitalization follow-up

occurred on March 22, 2019, (3) Dr. Jasso suggested that Plaintiff "should be assessed more on the effects of fatigue," (4) Dr. Getz stated that Plaintiff reported "experiencing headaches and fatigue after engaging in activities . . . [that] affect[ed] aspects of her cognitive functioning" but "[o]pinions regarding improvement in physiological symptoms . . . [were] outside the scope of [his] area of expertise," and (5) contrary to Dr. Jasso's suggestion, Plaintiff's fatigue had been "clinically quantified," insofar as Dr. Laughlin observed and treated Plaintiff, considered Plaintiff's self-reports and specialists' reports, and quantified that Plaintiff could only work reduced, part-time hours because of her PCS symptoms. (HART 394, 496, 585, 628, 656-57, 788-89, 808; STD AR 115-18.)

Further, Dr. Herzog found that Plaintiff was unable to work full-time until May 15, 2019 but failed adequately to explain why Plaintiff's receipt of "compensatory strategies" during a May 14, 2019 speech therapy follow-up visit meant that she could work full-time as of May 15, 2019. (*See* HART 611-14.) Dr. Herzog seemed to emphasize Plaintiff's participation in telephone or video visits (as opposed to in-person visits) and concluded that Plaintiff was "stable" after May 15, 2019. (*See* HART 611-14.) As Dr. Herzog appeared to acknowledge, Plaintiff's treatment focused on home exercise programs and rehabilitation-related actions and strategies that Plaintiff needed to perform at home and work. (*See* HART 612.) Of course, during a large portion of Plaintiff's treatment, there was an ongoing "pandemic, [which caused Plaintiff's medical provider's] departments [to try] to minimize in-person follow-up appointments." (HART 620.) With respect to Dr. Herzog's opinion that Plaintiff's condition was "stable" after May 14, 2019, such an opinion does not necessarily support that Plaintiff could work full-time in her own occupation as a family medicine physician. *See Timothy W. v. Berryhill*, No. 1:17-cv-01041-SB, 2018 WL 6817030, at *10 (D. Or. Oct. 16, 2018) ("[A]

PAGE 49 – FINDINGS AND RECOMMENDATION

doctor's notation that a condition is stable during treatment does not necessarily support the conclusion that the patient is able to work." (quoting *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008)); *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008) (noting that the administrative law judge or "ALJ" consistently "interpret[ed] reports that [the claimant's medical] condition has been 'stable' to mean that [the claimant's] condition has been good, when the term could mean only that her condition has not changed").

Defendant suggests that its medical consultants only needed to perform pure-paper file reviews because Dr. Tongue conducted "precisely the type of in-person examination that [Defendant] could have ordered," and did so "six months after the end of the Elimination Period, and four months before Plaintiff applied for LTD benefits[.]" (Def.'s Resp. Pl.'s Mot. ("Def.'s Resp.") at 6, ECF No. 20.) Defendant also argues that Plaintiff "cannot escape the fact that Dr. Tongue's 'battery of tests' did not support Plaintiff's subjective reports," and Dr. Tongue never opined that "Plaintiff has any cognitive impairments at all, much less that she has any work-related restrictions or limitations due to any cognitive impairments." (*Id.* at 5.) The Court disagrees.

Contrary to Defendant's arguments, the Court concludes that Dr. Tongue's opinion supports Plaintiff's subjective reports of persistent PCS symptoms like fatigue, and the opinions and findings from Plaintiff's treating and examining medical providers, such as Dr. Laughlin. To be sure, Dr. Tongue explained that Plaintiff's "neuropsychological testing did not show any evidence of deficit," but Dr. Tongue nevertheless opined that Plaintiff reported a "pattern of symptoms consistent with [mTBI] . . . , including complaints of word finding difficulty, fatigue, and headache brought on by mental effort," Plaintiff "appear[ed] to be suffering from [PCS,] . . . a complex phenomenon which is thought to have multifactorial influences," Plaintiff

"describ[ed] what would be expected [in mTBI cases], which is a continuous pattern of improved functioning over time," that "[a]pproximately [ten percent] of patients with mild uncomplicated TBI continue to complain of headache with mental effort and fatigue a year following the injury," and Plaintiff "appear[ed] to be part of that [ten] percent of the population of individuals who have suffered a mild uncomplicated [TBI]." (HART 649-58.) Dr. Tongue added that he "anticipate[d] that [Plaintiff] will continue to see improvement over the next [twelve] months [i.e., March 2020 through March 2021] but may experience some persistence of some symptoms such as headache with fatigue and a decrease in cognitive efficiency when fatigued." (HART 658.)

Defendant describes Dr. Tongue's opinion as the "best evidence of Plaintiff's functional capacity." (Def.'s Reply at 1) (bold and caps omitted). As Dr. Tongue anticipated, Plaintiff experienced persistent PCS symptoms. Relatedly, and as Dr. Laughlin explained, Plaintiff's persistent PCS symptoms, such as fatigue and decreased stamina, prevented her from working full-time as a family medicine physician. *See Goodman*, 2023 WL 3224481, at \*10 (noting that unremarkable imaging did not "invalidate [the plaintiff's] consistent reports of visual symptoms, and [an examining doctor's] report offer[ed] the best explanation of [the plaintiff's] symptoms consistent with the medical evidence," and that "[v]ertigo, fatigue, and nausea are subjective experiences that cannot be easily measured by an objective standard, but that does not mean such symptoms should be discounted or disbelieved") (simplified); *see also Bethany Coleman-Fire v. Standard Ins. Co.*, No. 3:18-cv-00180-SB, 2019 WL 2011039, at \*1 (D. Or. May 1, 2019) ("[M]edical literature reports that roughly [fifteen percent] of [PCS] patients complain of problems *more than* [twelve] months after injury, and these patients are likely to experience

persistent and intrusive symptoms that may be refractory to treatment and impose a lifelong disability.") (simplified).

Defendant and its medical consultants fail adequately to address what evidence was required to find disability based on PCS symptoms. *Cf. Veronica L.*, 647 F. Supp. 3d at 1038-39 (focusing on the preliminary matter of "what evidence [was] required to find disability based on [chronic fatigue syndrome,]" which is premised largely on the patient's subjective reports, not objective evidence, and explaining that "evaluating disability caused by [chronic fatigue syndrome] is essentially a credibility determination"). Defendant acknowledges that the LTD plan "does not specifically require objective medical evidence of functional impairment," and that "[a] concussion may be a 'subjective' diagnosis[.]" (Def.'s Reply at 4.) Indeed, courts and commentators have also noted that mTBI and PCS is often established through subjective reports, not objective evidence:

> . . . . Medical professionals agree that there are various levels of TBI, including a wide spectrum of mild TBI. The severity of TBI is typically defined at the time of the initial injury but the severity of the injury defined initially does not necessarily predict the trajectory or natural history of TBI, as individuals diagnosed with mild TBI can experience ongoing impairment. Here, for example, multiple doctors noted that [the petitioner] suffered more severe symptoms and suffered longer than a typical mild TBI patient would.
>
> . . . .
>
> . . . . There is no agreed-upon definition of m[ild] TBI or concussion, because there is no consensus on objective criteria for defining and diagnosing this type of injury. Rather, m[ild] TBI currently remains a subjective clinical diagnosis based primarily on patient history and observable behavioral symptoms. . . . It is not surprising that [a] spectrum of symptoms exist[], considering the diverse ways in which a brain injury can happen, as well as the different brain structures that could be affected by the external trauma. . . . [T]herapy for brain repair is controversial; the type of care the individual should receive during recuperation is not agreed upon.

*Couret-Rios v. Fire & Police Emps.' Ret. Sys. of City of Balt.*, 227 A.3d 637, 653-54 (Md. 2020) (simplified); *see also Rodman v. Deangeles*, 47 N.Y.S.3d 747, 750 (N.Y. App. Div. 2017)

PAGE 52 – FINDINGS AND RECOMMENDATION

(explaining that "negative scans were not out of the ordinary" in concussion cases because "usually no . . . injury can be seen on a CT scan," there was testimony that "the majority of concussions do not show up on imaging," a "concussion, by its very definition, is a subjective diagnosis," a "concussion diagnosis is a clinical diagnosis that necessarily relies on a patient's subjective complaints, as well as the patient's medical history and certain inclusion criteria," and "clinical observations of a plaintiff's limitations may constitute objective evidence") (citation omitted); *Chavarria v. Indus. Comm'n of Ariz.*, No. 2 CA-IC 2017-0002, 2017 WL 4176202, at *5 (Ariz. Ct. App. Sept. 21, 2017) ("[A]lthough [the doctor whose opinion the administrative law judge adopted] stressed that he did not 'find any objective evidence of any . . . neurological dysfunction,' he acknowledged that post-concussive syndrome is a clinical diagnosis attended by a 'constellation' of subjective symptoms. Indeed, as . . . [another] neurologist[] explained, '[s]ometimes post-concussive syndrome does not show up on any type of scan, CT or MRI scan.'"); *id.* (observing that a primary care physician explained that "you can't really tell by a CAT scan or MRI scan if someone has got post[-]concussive syndrome," post-concussive syndrome is "a clinical diagnosis," and "there's something that goes on in the brain that's not real easy to see or measure that causes changes over a long period of time, including months and years or maybe even decades later, as . . . seen in some of the sports-related [cases] that have come up"); *Ilarda v. Chater*, No. 95-cv-02180, 1996 WL 389366, at *15 (E.D.N.Y. July 8, 1996) (holding that the plaintiff was entitled to disability benefits and noting that "[a]lthough the ALJ was correct in stating that [the treating physicians'] findings were not supported by 'objective evidence,' . . . the nature of post-concussion syndrome is such that objective findings are not always available").

///

PAGE 53 – FINDINGS AND RECOMMENDATION

Nevertheless, Defendant maintains that it was entitled to favor objective evidence—in particular, "Dr. Tongue's cognitive tests [that] did not reveal any cognitive impairments that would preclude work functioning"—over Plaintiff's subjective reports. (Def.'s Reply at 4.) The Court concludes that Defendant's approach was improper.

Importantly, Defendant and its medical consultants fail adequately to address the portions of Dr. Tongue's opinion that support Plaintiff's subjective reports, which is the primary evidence that captures how Plaintiff's work environment and the progression of Plaintiff's normal workdays and workweeks as a family medicine physician impacted her performance, functioning, and ability to persist. (*See* HART 368, May 5, 2021, noting that Plaintiff reported "decreased endurance and worsening cognitive and executive function performances as the day progresses," and Dr. Tongue's evaluation was "done in the morning [and] protected from [a] stimulati[ng] environment"). In the Court's view, Plaintiff's self-reports are significant and probative evidence of her ability to persist and work full-time in her own occupation, and Defendant and its medical consultants improperly focused on and isolated certain objective evidence. *See Tam v. First Unum Life Ins. Co.*, 491 F. Supp. 3d 698, 711 n.11 (C.D. Cal. 2020) ("Unum's doctors' focus on the lack of objective evidence was improper because [the condition here] is not established through objective evidence."); *see also Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (observing that a clinical interview is an "objective measure[]"); *cf. Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 873 n.3 (9th Cir. 2008) (explaining that "[w]hile the rules and presumptions of our Social Security case law do not apply to ERISA benefits determinations, . . . [Ninth Circuit] Social Security precedents are relevant for the[ir] factual observation[s]," which are "true for [both] ERISA beneficiaries . . . [and] Social Security claimants").

PAGE 54 – FINDINGS AND RECOMMENDATION

Further, the Court notes that Plaintiff presented for in-person, telephone, and video visits with numerous providers during the time periods in question and none of those providers questioned whether Plaintiff was exaggerating or over-reporting her symptoms. On the contrary, Plaintiff's long-time primary care physician, Dr. Laughlin, reported that Plaintiff was "doing her utmost to return to work and function professionally, even at the expense of her personal life outside of work." (HART 585.) Dr. Laughlin also called Defendant after reviewing its initial medical consultants' opinion, "state[d] that even people with normal physical exam[s] [cannot] function as a physician with [Plaintiff's] condition," questioned whether Defendant's consultants received all of Plaintiff's medical records, and added that Plaintiff was "doing her u[t]most to try to do as much as she can and [Plaintiff was] not malingering or exaggerating." (HART 41.) Additionally, Dr. Tongue had Plaintiff complete the Personality Assessment Inventory ("PAI"), which "contains several symptom validity scales embedded within the measure," and Plaintiff's profile was "entirely within normal limits," with "no indication of the presence of a somatization or a conversion disorder in the profile." (HART 628, 656.) Dr. Getz recognized that "symptom validity was not thoroughly evaluated [by Dr. Tongue] to be consistent with a medico-legal evaluation, [but conceded] that there was no indication of clinically elevated findings to suggest the presence of symptom magnification [during Dr. Tongue's evaluation]." (HART 628.)

In summary, the Court concludes that Plaintiff satisfied her burden of proving by a preponderance of the evidence that she was disabled under the terms of the LTD plan throughout and beyond the elimination period and through the close of the record and that Defendant incorrectly denied Plaintiff's claim for LTD benefits. Accordingly, the Court recommends that

PAGE 55 – FINDINGS AND RECOMMENDATION

the district judge grant Plaintiff's motion for judgment and deny Defendant's motion for judgment.[10]

### 2.    Remaining Considerations

Defendant argues that even if Plaintiff satisfied her burden of proving that she was disabled, Plaintiff's LTD claim would "terminate after March 13, 2020, at the latest," because she "failed to provide, during either the claims process or the appeals process, any records of treatment with any physician or other provider from March 13, 2020 until . . . January 2021." (Def.'s Mot. at 3.) Defendant states that it is not asserting a new reason for denying benefits; rather, it is asserting that if the Court "overturn[s] [its] initial benefits decision, then the 'Regular Care of a Physician' provision would apply to terminate benefits *after* March 13, 2020." (Def.'s Reply at 9.)

Despite its claim to the contrary, Defendant is asserting a new reason for denying LTD benefits. Defendant's October 6, 2020 and September 24, 2021 letters did not cite any gaps in the record, or Plaintiff's failure to demonstrate that she was under the Regular Care of a Physician, as grounds for denying Plaintiff's LTD claim in part or as of a certain date. (*See* HART 101-04, 119-24.) Instead, Defendant found that the evidence did not support disabling "limitations through and beyond the Elimination Period," and "[b]ecause of this, the denial of [Plaintiff's LTD] claim [was] considered appropriate[.]" (HART 103; *see also* HART 121-22, reviewing whether Plaintiff "met the definition of Disability through and beyond the Elimination Period," and finding that Plaintiff could perform the essential duties of her occupation as of September 14, 2019).

---

[10] Given this recommendation, the Court does not address Plaintiff's claim that Defendant "misstates the relevant date, which is September 14, 2019," not May 2019. (Pl.'s Resp. at 3) (bold omitted).

PAGE 56 – FINDINGS AND RECOMMENDATION

"[A] district court cannot adopt post-hoc rationalizations that were not presented to the claimant . . . during the administrative process." *Collier*, 53 F.4th at 1182 (citing *Harlick*, 686 F.3d at 719-21). The Court therefore declines to adopt Defendant's post-hoc rationalization here.

Even assuming Defendant is not asking the Court to adopt a post-hoc rationalization, the Court finds unpersuasive Defendant's reliance on any gap in Plaintiff's treatment records. The record reflects that at all relevant times, Plaintiff was under the regular care of a physician. Dr. Laughlin's opinions and treatment records demonstrate that Plaintiff was under Dr. Laughlin's care at the beginning and through the close of the record, and Dr. Laughlin was aware of all of Plaintiff's PCS-related treatment during the relevant time periods. (*See* STD AR 115-18, noting that on March 22, 2019, four days after the accident, Plaintiff presented for a post-hospitalization follow-up visit with Dr. Laughlin; HART 585, 911, demonstrating that on February 13, 2020 and September 24, 2020, respectively, Dr. Laughlin extended Plaintiff's reduced/part-time work hours from May 20, 2019 through July 1, 2020 because of Plaintiff's ongoing PCS symptoms and need for treatment, and reported that Plaintiff could only work five hours per day; HART 256-57, 340-41, reflecting that Defendant asked its appeal consultants to review and address the treatment note from Dr. Laughlin's August 25, 2021 video visit with Plaintiff).

The Court also notes that Dr. Laughlin's September 8, 2020 response to Dr. Herzog's questions noted that between July 29, 2020 and August 26, 2020, Plaintiff received treatment on five occasions (two speech therapy telephone follow-ups and physiatry, occupational therapy, and physical therapy video visits). (HART 620.) In her September 24, 2020 response to Dr. Getz's questions, Dr. Laughlin also relied on Dr. Mirchandani's physiatry appointment on July 31, 2020 (i.e., the physiatry visit noted in the response to Dr. Herzog) and Plaintiff's

PAGE 57 – FINDINGS AND RECOMMENDATION

Standardized Assessment of Concussion ("SAC") symptom inventory on July 31, 2020.[11]
(HART 584-85.)

Defendant emphasizes that "neither Dr. Laughlin nor Plaintiff provided any of these [five July and August 2020] records for consideration," and that "[i]f these records do exist, and if Plaintiff wanted [Defendant] to consider them, Plaintiff had multiple opportunities to provide them to [Defendant]." (Def.'s Resp. at 11.) The Court is not persuaded by Defendant's arguments.

The record suggests that Plaintiff signed all of the authorizations necessary for her employer to obtain and disclose her medical information to Defendant. (*See* HART 349-50, 475-82, 920, 928-29.) It is not clear why the five records at issue are not part of administrative record or why, given Dr. Laughlin's responses to Defendants' consultants' questions or if Defendant believed that it needed the records, Defendant did not make any effort to obtain them before denying Plaintiff's claim or appeal. (*See* HART 19, noting that Defendant asked for the contact information for Kaiser and BRN to "request records as a courtesy"). It is clear, however, that Dr. Laughlin represented that Plaintiff participated in these five treatment visits and that she reviewed Dr. Mirchandani's treatment note and assessment on July 31, 2020. (HART 584-85, 620.) Additionally, the record lends support to Dr. Laughlin's representations that these records do, in fact, exist. (*Compare* HART 330, reflecting that on May 5, 2021, Dr. Koutzeva-Dussel, a physiatrist, noted that Plaintiff was "seen by Dr. Mirchandani last on [July 31, 2020] for evaluation of [her] PCS [status post-]head trauma with loss of consciousness," and copied and pasted notes from Dr. Mirchandani's visit, including notes about asking Plaintiff to "[p]lease contact Dr. Tongue to have [her March 13, 2020] [n]europsychology test results sent to Kaiser"

---

[11] The record includes other SAC symptom inventories from Plaintiff's physiatry visits. (*See* HART 330-31, 884-85.)

PAGE 58 – FINDINGS AND RECOMMENDATION

and a referral to "physical therapy for impaired balance/vertigo," *with* HART 891, showing that on February 5, 2020, Dr. Mirchandani asked Plaintiff to return for a follow-up visit "after neuropsych testing").

Finally, Defendant suggests that Plaintiff apparently filled out and submitted an unsigned attending physician's statement in July 2020 (*see* HART 912-13), which according to Defendant, constitutes an admission that Plaintiff was "not regularly treating with any physician (and therefore could not get a physician to complete the form for her) and did not have any physical or cognitive limitations that prevented her from working in her own occupation as a family practice physician full time." (*See* Def.'s Mot. at 27, stating that Plaintiff "apparently filled out and submitted" the July 2020 attending physician's statement and "all but admitted" that she was not under the regular care of a physician in July 2020; Def.'s Resp. at 10, arguing that the July 2020 attending physician's statement was "an admission" and "plainly completed by Plaintiff herself"). The Court concludes that the record does not support Defendant's speculative arguments.

The record suggests that Plaintiff provided an incomplete attending physician's statement to Dr. Laughlin and Plaintiff's employer's release of information specialist faxed the incomplete form to Defendant, along with Dr. Laughlin's December 23, 2019 work status report and February 13, 2020 attending physician's statement, which extended Plaintiff's reduced hours from May 20, 2019 through July 1, 2020. (*See* HART 910-18, listing corresponding fax date, time, and page numbers). The record does not support Defendant's assertion that Plaintiff was not under the regular care of a physician and could not get a physician to complete the form in July 2020.

///

PAGE 59 – FINDINGS AND RECOMMENDATION

In sum, the Court recommends that the district judge reject Defendant's claim that the Regular Care of a Physician provision would apply to terminate benefits after March 13, 2020.

## CONCLUSION

For the reasons stated, the Court recommends that the district judge DENY Defendant's motion for judgment (ECF No. 17) and GRANT Plaintiff's motion for judgment (ECF No. 18).

## SCHEDULING ORDER

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 4th day of December, 2023.

HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 60 – FINDINGS AND RECOMMENDATION